GERMAINE E. TOMLINSON *v.* HAROLD TOMLINSON.

[No. 2-275A48. Filed Agust 19, 1976. Rehearing denied September 14, 1976. Transfer denied December 6, 1976.]

*Franklin I. Miroff, Klineman, Rose and Wolfe,* of Indianapolis, for appellant.

*James S. Buck, Buck Berry Landau Breunig and Quinn,* of Indianapolis, for appellee.

SULLIVAN, J.—A decree of divorce occasions this appeal. Appellant (Germaine) challenges the alimony award alleging that the court erroneously considered an antenuptial agreement; that the award is inadequate; and that the court erroneously sanctioned Harold's transfer of certain real estate prior to the divorce.

The statutory provisions governing this divorce were repealed subsequent to commencement of this litigation and were replaced by the Dissolution of Marriage Act. Ind. Ann. Stat. 31-1-11.5-1 *et seq.* (Burns Code Ed. 1976 supp). Our determination in this appeal does not necessarily indicate future resolution of similar issues.

Germaine and Harold both had children from previous marriages. Germaine was employed at one of Harold's businesses. They eventually developed an intimate relationship and conceived a child. On May 21, 1970, two months after the birth of the child, Germaine, age 30, and Harold, age 46, were married. Immediately preceding the marriage ceremony, Germaine and Harold entered into the following antenuptial agreement.[1]

"WHEREAS, Suzy M. Chantegros, [Germaine] hereinafter referred to as Suzy and Harold Tomlinson, hereinafter referred to as Tom desire to enter into a marriage on the 21st day of May, 1970, and,

WHEREAS, Tom has been a widower for a period of approximately three years and has children of his own and both parties desire to protect what Tom has earned and preserved (sic) the same for his children, and

WHEREAS, the parties agree that Tom has a home at 2417 Knollwood Drive, Indianapolis, Indiana, and that he owns Bamberg Realty, which has at least five pieces of property, together with a one-half interest in Western Parks, Inc., and

---

1. Harold stated that he had consented to marry Germaine only on condition that he protect his life's earnings for the benefit of himself and his two daughters of the previous marriage.

WHEREAS, both of the parties have made full disclosure to the other regarding the financial situation in the estate of each,

IT IS NOW, THEREFORE, AGREED, that *in the event of a divorce* between Suzy and Tom, that *Suzy will not ask for and agrees not to receive any part of the above listed property or accumulations of property or money earned prior to the marriage of the parties.* This agreement is voluntarily entered into by and between the parties both being satisfied of full disclosure by the other of the extent of their interest and in no way precludes Suzy from asking for a divorce at some future time, asking for counsel fees in such a divorce or asking for support for any children that might be born of this marriage." (Emphasis supplied.)

Following the marriage, Germaine and the baby moved into Harold's home where he was living with his other two daughters. Germaine's previous children lived elsewhere. In 1973, Harold suffered a heart attack. During his recovery over several months, Germaine conducted his business affairs. Throughout the marriage she was responsible for all household duties and some tasks associated with Harold's business. However, four stormy years of marriage resulted in separation February 22, 1974 and finally in divorce on October 15, 1974.

The evidence disclosed Harold's net worth to be approximately $300,000—$400,000 at the time of trial. The interpretations of the evidence drawn by both parties show his net worth at the time of the marriage to have been in the same value range, having appreciated by only $12,000 during the marriage.

In its divorce decree the trial court concluded that the antenuptial agreement was valid. Germaine was awarded $10,400 alimony. She was also awarded custody of their child, and child support allotments which are not challenged.

## I.

## VALIDITY OF ANTENUPTIAL AGREEMENT

Germaine first alleges that the trial court committed reversible error when it admitted into evidence and considered

the antenuptial agreement with respect to the alimony award. She asserts that the agreement is invalid (1) as a matter of public policy and (2) as the product of duress and non-disclosure.

It has been held as a general rule that, with respect to property distribution upon the death of one of the parties, antenuptial agreements are favored by the law because they tend to promote marital harmony and to facilitate the judicial process by eliminating unnecessary litigation. *McNutt* v. *McNutt* (1888), 116 Ind. 545, 19 N.E. 115; *McClain's Estate* v. *McClain* (1962), 133 Ind. App. 645, 183 N.E.2d 842; *Baugher* v. *Barrett* (1957), 128 Ind. App. 233, 145 N.E.2d 297. However, under certain circumstances antenuptial agreements have been considered invalid: (a) where fraud or duress has been practiced; (b) where the agreement promotes divorce or restrains marriage; or (c) where the Statute of Frauds has been contravened. *Clark, Law of Domestic Relations* § 1.9 (1968).[2]

Our matter of concern in the instant appeal is whether an antenuptial agreement which contains provisions in contemplation of separation or divorce, necessarily weakens the protection which the law accords the family/marital relationship.

While the parties to a marriage have had the full support of law when they have antenuptially agreed to property distribution or other financial arrangements upon death, they have not had the sanction of the law when they have agreed to similar terms conditioned upon divorce or separation.

This position was explained in *Watson* v. *Watson*, (1906), 37 Ind. App. 548, 551, 77 N.E. 355:

"If we should adopt appellant's construction of the antenuptial contract it would be in effect affirming a rule of law authorizing parties contemplating marriage to fix in ad-

2. In *McClain's Estate* v. *McClain, supra,* provision for property distribution upon death was upheld despite the invalidity of a clause relating to the contingency of divorce or separation.

vance the husband's liability for alimony in case either shall obtain a divorce. This we can not do. While the law in this State is firmly fixed giving parties the right to adjust and settle property interests by antenuptial contract (*Leach* v. *Rains* [1897], 149 Ind. 152; *Kennedy* v. *Kennedy* [1898], 150 Ind. 636), and to have such settlement recognized and enforced by the courts, yet such settlement must be free from fraud or imposition (*Kennedy* v. *Kennedy, supra*), and not against public policy (*Neddo* v. *Neddo* [1896], 56 Kan. 507, 44 Pac. 1).

It is also equally well settled that the husband is bound to support his wife. *Rariden* v. *Mason* (1903), 30 Ind. App. 425; *Scott* v. *Carothers* (1897), 17 Ind. App. 673. This legal obligation is a part of every marriage contract. It is a duty imposed upon the husband by law, and from this obligation he can not shield himself by contract. To hold otherwise would be to invite disagreement, encourage separation, incite divorce proceedings and commend a principle which would be a menace to the welfare of society, contrary to public policy, and tending to overthrow and destroy every principle of the law of marriage requiring that husband and wife shall live together during their natural lives, and that the husband, within his financial ability, shall furnish the wife with reasonable necessaries for her support and home comforts in sickness and in health, as by law he is required to do." See also cases collected at 57 A.L.R.2d 942.

The traditional division of labor and consequent dominant role of the male in marriage and in society account in part for the reluctance shown by courts to recognize many antenuptial agreements. This concern has been expressed frequently in terms of the husband's "duty to support his wife". See *Watson* v. *Watson, supra*. This duty, in terms of divorce settlements, is more appropriate to a consideration of alimony as support rather than alimony as a method of property distribution. See *Wellington* v. *Wellington* (1973) 158 Ind. App. 649, 304 N.E.2d 347.

This distinction was noted by the Florida District Court of Appeals in *Lindsay* v. *Lindsay* (1964 Fla. App.) 163 So.2d 336 wherein property distribution provisions were distinguished from support provisions in antenuptial agreements conditioned upon divorce. Subsequently, however, the Florida

Supreme Court recognized the validity of all antenuptial agreements, if fairly entered, whether dealing with property rights or support rights. See *Posner* v. *Posner* (1972 Fla.), 257 So.2d 530. To the same effect is *Hudson* v. *Hudson* (1960 Okla.), 350 P.2d 596.

Judicial decisions traditionally assimilate the mores of society. If they did not, the law would tend toward repression and unresponsiveness to the realities of human conditions. We have given careful attention to indicators of human events, including the sequence of judicial decisions which address the validity of antenuptial agreements. In so doing we find that our neighbor, Illinois, has recently had occasion to do the same.

*Volid* v. *Volid* (1972), 6 Ill. App. 3d 386, 286 N.E.2d 42 involved an antenuptial agreement with an absolute limitation of $75,000 upon the husband's liability for alimony, support, and with respect to property distribution. That agreement was fairly entered into with full knowledge by the parties and with advice of counsel on both sides and "did not attempt to *avoid* the duty of support" 286 N.E.2d at 45 (Emphasis supplied). The holding, however, placed little or no significance upon the distinction between avoidance of support and limitation of support. The court there addressed itself to the changed and changing mores of society.

> "Here the agreement does not attempt to regulate the operation of a functioning family or the amount of support to be provided while the parties were living together, but it anticipates the possibility of a time when the marital relationship has broken down and the parties are separated by decree.
>
>         *   *   *
>
> "In cases from other jurisdictions which we have reviewed at length, antenuptial agreements which totally eliminated the right to support or which made inadequate provisions for support have been held to violate public policy. (citation omitted.)
>
> The reasons given in these cases for holding as void provisions eliminating the obligation of support upon divorce are

(1) that the state's interest in the preservation of the marriage relationship could be defeated by agreements which provide for, facilitate, or tend to induce a separation or divorce of the parties after marriage and (2) that the state has an interest in seeing that a divorced woman has adequate support so that she will not become a charge of the state. The assumptions on which these reasons are based should be examined. It is often declared that the state has a vital interest in the maintenance of the family, but this interest does not require that persons, once married, must live together forever without regard to the breakdown of their relationship. The necessity of granting divorces is recognized, and the grounds upon which one can be granted are expanding.

\* \* \*

"Many cases state, categorically that a husband has a duty to support his wife. This is unquestionably true when the wife is in need of such support. However, when a marriage breaks down and the husband and wife are divorced, the wealth and income of the wife are always considered in determining whether an alimony award should be made and if so in what amount. (citations omitted.)

When the rules regarding the husband's duty of support were first enunciated, the roles of a husband and wife were more rigid and defined. The husband worked and brought income into the family while the wife maintained and managed the household. The woman generally did not seek outside employment partly, because 'her place was in the home', and partly because few opportunities for meaningful employment were available. Married women nowadays are increasingly developing career skills and successfully entering the employment market. Where a woman is trained, healthy and employable, and where a woman's efforts have not contributed to her husband's wealth or earning potential, the necessity for an alimony award upon breakup of the marriage is not great.

\* \* \*

"Once it appears (1) that some marital rights may be waived before the wedding and (2) that the right to support can be terminated upon divorce, it would be anomalous to hold that the parties cannot plan and agree on a course of action in the event that the marriage is unsuccessful and ends in divorce. Particularly is this true where the parties are older and where there is little danger that either party would be without support. The incidence of divorce in this country is increasing, and consequently more persons with

families and established wealth are in a position to consider the possibility of a marriage later in life. Public policy is not violated by permitting these persons prior to marriage to anticipate the possibility of divorce and to establish their rights by contract in such an event as long as the contract is entered with full knowledge and without fraud, duress or coercion. . . ." 286 N.E.2d 42 at 46-47.

## (A) ANTENUPTIAL AGREEMENT NOT INVALIDATED BY PUBLIC POLICY AND COURT MAY GIVE AGREEMENT EFFECT DEPENDENT UPON CIRCUMSTANCES

In this case, we need not go so far as have the Florida, Illinois and Oklahoma courts, *supra,* for our antenuptial contract neither absolved Harold from any support duty nor did it place a maximum limitation upon any property distribution liability. In this connection it is well to note that the holding in *Watson* v. *Watson, supra* was governed by a consideration of alimony as a method of providing continuing support rather than as a means of effecting property distribution. It is further apparent that the particular contract provision questioned in *Watson* provided an absolute $200 limit on the husband's liability in the event of separation. The contract here involved is thus distinguishable. By its terms, it refers only to specified property owned by Harold at the time of the marriage and does not purport to affect any continuing duty of support which might be reflected by an alimony award. By its terms it does not purport to place a monetary or measurable limit upon Harold's contingent alimony liability. It merely sets over to him certain of his own property.

Nonetheless, whether a particular antenuptial agreement concerns property distribution or alimony in the form of support in the event of divorce, we deem the changed and changing status of the male vis a vis the female to lend particular significance to the holding in *Volid* v. *Volid, supra,* by the Illinois Court of Appeals and to the tenor of the dissenting opinion in *Fricke* v. *Fricke* (1950), 257 Wis. 124, 42 N.W.2d 500 at 502:

"Public policy, of course, favors marriage and is concerned with its stability. I think it must be conceded that, in other relationships, contracts defining the expectations and responsibilities of the contracting parties promote stability. If they are desirable in other human activities there should be, at least, no presumption that they tend to promote discord in marriage. And even in marriage any one can think of possible problems which it is well to be agreed upon before the ceremony. Yet the court holds that when an antenuptial agreement touches the financial provision, no matter how generous, by a husband for a wife in the event of divorce is in *malum in se* and shall be outlawed regardless of circumstances.

. . . Although it is well established that she may give up her share of his estate in case of his death the court now says that she may not do so in case of divorce, regardless of circumstances. Hence these people may not marry. I see no resulting benefit to society or any such requirement of public policy. Therefore it appears to me to be impossible to say dogmatically that the influence of such antenuptial agreements tends to destroy rather than to promote and conserve marriage. It depends on the circumstances of the individual case and I should suppose that public policy would require the circumstances to be considered before it could safely be announced that the influence of a particular antenuptial contract was evil."

As heretofore stated, Germaine and Harold did not agree to limit Harold's duty to support insofar as such may have existed under prior law, nor did they attempt to deprive Germaine of any assets acquired or increased as a result of her contribution. The agreement purported only to exempt certain property previously accumulated by Harold. The parties were free to build additional assets without limitation upon the share of either party in these subsequent assets.

We cannot say that antenuptial agreements conditioned upon the possibility of divorce are invalid per se, and under these circumstances we do not find a contract which promoted divorce.

Indicative of the great revision of the views reflected in *Watson* v. *Watson, supra,* at the time Germaine and Harold executed their antenuptial agreement, are provisions of the

Dissolution of Marriage Act which favor such agreements. Ind. Ann. Stat. § 31-1-11.5-10 (Burns Code Ed. 1976 supp) ; *Flora* v. *Flora* (1975), 166 Ind. App. 620, 337 N.E.2d 846 at 851.

We therefore hold that an antenuptial agreement which speaks to a proposed property distribution in the event of divorce is not per se void as against public policy. Rather it is to be presumed valid unless surrounding circumstances show it to have been entered without full knowledge or entered as the result of fraud, duress, or coercion. Further, it is within the discretion of the trial court to consider a valid antenuptial agreement in its allocation of the property of the parties.

However, such an agreement is not binding upon the court. Since circumstances existent at the time of divorce may be substantially different than those which existed at the time of the agreement, a valid agreement is but one factor to be considered among the several factors upon which the court customarily relies to make an equitable distribution of property.[3] Here, the decision of the trial court to consider the antenuptial agreement was within these perimeters. We therefore, find no error in the acceptance into evidence and the consideration of the antenuptial agreement.

(B) CONFLICTING EVIDENCE PRECLUDES REVERSAL UPON ASSERTION THAT ANTENUPTIAL AGREEMENT WAS PRODUCT OF DURESS AND NON-DISCLOSURE

We cannot overturn the determination of the trial court upon Germaine's assertion that duress and non-disclosure invalidated execution of the antenuptial agreement. The testimony was conflicting as to Germaine's overall knowledge of

---

3. One commentator submits that a substantial reason for the invalidation of antenuptial contracts is that provisions which are fair and equitable at the time they are made may not be fair at a later time when divorce occurs. *Clark, Law of Domestic Relations, supra,* § 1.9.

Harold's business holdings, her ability to comprehend written English, and the mutual understanding about the basis for the agreement. The trial court was in a position to weigh the testimony and to consider the demeanor of the witnesses. We are not. The testimony is not without conflict and the testimony is not subject to a single inference contrary to that reached by the trial court. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N.E.2d 669.

## II.
## ALIMONY AWARD NOT INADEQUATE
## AS A MATTER OF LAW

Germaine contests the adequacy of the alimony award in light of the relative financial status, contributions, and earning ability of the parties. The trial court was vested with broad discretion to make provision for property distribution and make an alimony award. As heretofore noted, such discretion exists in light of, or notwithstanding, a valid antenuptial agreement.

We may reverse the trial court's determination in this respect only if the court abused its discretion. Here, the court was within the proper bounds of its decision-making authority to set apart for Harold's benefit that property accumulated before marriage in accordance with the antenuptial agreement. Of course, in so doing, the court had the responsibility to weigh all of the various factors bearing upon an equitable apportionment of the property acquired after marriage and to determine whether, beyond this, any support was appropriate for Germaine. See *Wellington* v. *Wellington, supra.*

Here, the net assets accumulated during the marital union were valued at $12,000. Both parties agreed that Germaine had contributed to Harold's business operations, as well as to the operation of the household, especially during the time of Harold's serious and incapacitating illness. The $10,400 award to Germaine may well reflect the court's acknowledgment of her contribution by setting over to her the lion's share of the

$12,000 net increase in assets. This award leaves Germaine in an enhanced financial position as compared with her status at the time of marriage. Harold, on the other hand, is left in substantially the same financial position he had at the time of the marriage, taking into consideration the inflationary economic climate and losses he otherwise might have sustained as a result of his illness. It was within the trial court's discretionary power to conclude that the relative ages of the parties, their relative health, the short duration of the marriage, and thus the short term of Germaine's contribution to the accumulation of marital property, justified the alimony award given. That the same circumstances might justify a more liberal award does not permit this court to substitute its judgment for that of the trial court.

## III.

### REAL ESTATE SUBJECT TO TRANSFER BY HUSBAND PRIOR TO DIVORCE NOT NECESSARILY INCLUDABLE AS PART OF MARITAL ASSETS

Germaine asserts that the trial court erred in arriving at a property settlement when it refused to consider the homestead property which Harold transferred during the marriage. Harold owned the homestead property prior to the marriage. It had been the residence of his family during his previous marriage and remained his residence and that of his daughters after the death of his former wife. The property was specifically designated in the antenuptial agreement to be excluded from any prospective property distribution between Harold and Germaine in the event of divorce. During the marriage to Germaine, Harold transferred the property to himself and one of his daughters. This transfer took place shortly after the effective date of Ind. Ann. Stat. § 29-1-2-3.1 (Burns Code Ed. 1976 supp.) which permits a husband to transfer his individually owned property without joining his wife, thus

eliminating the inchoate interest of a wife in property held by her husband.

Germaine argues that her inchoate interest vested at marriage; that she could not be divested of that interest by the new statute; and that the transfer constituted a taking of her property without due process. The factual posture of this case concerning the transfer does not contain an aura of fraud as found in the factual assertions made in *Wireman* v. *Wireman* (1976), 168 Ind. App. 295, 343 N.E.2d 292; nor need we reach the question whether an inchoate interest can be extinguished by an act of the Legislature or by the unilateral act of a husband.

Even were we to assume *arguendo* that Germaine's interest was unaffected by the statutory change, we must still acknowledge that when the property rights of the parties were adjusted by the court, any interest Germaine might have had in the realty held by Harold was thereby extinguished. By a decree, a court may extinguish even an entirety interest or a fee simple absolute. See *Draime* v. *Draime* (1961), 132 Ind. App. 99, 173 N.E.2d 70.

Judgment affirmed.

White, J. and Hoffman, J., sitting by designation concur.

NOTE.—Reported at 352 N.E.2d 785.