**Patricia Ann JUSTUS Appellant–Petitioner,**

**v.**

**Walter J. JUSTUS Appellee–Respondent.**

No. 49A02–9008–CV–455.[1]

Court of Appeals of Indiana,
Fifth District.

Nov. 27, 1991.

Rehearing Denied Jan. 29, 1992.

Robert E. Saint, Coons & Saint, Charles F. Miller, Jr., Stewart, Due, Miller & Pugh, Indianapolis, for appellant-petitioner.

Wilson S. Stober, Andrew Z. Soshnick, Baker & Daniels, Indianapolis, for appellee-respondent.

**SHARPNACK, Judge.**

The principal issue in this case concerns the impact of a discharge in bankruptcy on the enforceability of an antenuptial agreement between a husband and wife who remain married after the filing of the bankruptcy petition by the husband. The case comes to us on an appeal by Patricia Ann Justus ("Wife") from a dissolution decree which she seeks to have reversed to require enforcement of an antenuptial agreement and an award of rehabilitative maintenance. Walter J. Justus ("Husband") cross-appeals and we consider the following issues raised by the appeals and restated by us:

I. Whether the trial court erred in finding that Wife's claim under the antenuptial agreement was not discharged by Husband's bankruptcy which he filed during the marriage.

II. Whether the trial court erred by finding that the antenuptial agreement was unenforceable due to circumstances existing at the time of dissolution which made it unconscionable.

III. Whether Wife should be estopped from seeking to enforce the antenuptial agreement due to her acceptance of benefits inconsistent with other provisions of the antenuptial agreement and her request for rehabilitative maintenance.

IV. Whether the trial court erred by failing to make special findings of fact concerning Wife's request for an award of rehabilitative maintenance where Wife had filed a request for special findings.

The facts most favorable to the decision of the trial court are as follows. The parties executed an antenuptial agreement shortly before they were wed on March 17, 1984. That agreement, in relevant part, provided that in the event of divorce, each party would keep all property and interests which that party brought into the marriage as well as all such property and interests acquired during the marriage in that party's separate name. In addition, the agreement provided for:

iv. Alimony payments arising out of the marital relationship as follows (for purposes of this subparagraph, the date that any legal proceeding for the divorce or dissolution is filed shall be deemed the last day of the marriage);

\* \* \* \* \* \*

b. If the last day of the marriage as herein defined occurs after thirty-six (36) months of marriage but prior to seventy-two (72) months of marriage, Prospective Husband shall pay to Prospective Wife alimony in the sum of Five Hundred Thousand Dollars ($500,000) payable as follows:

(Record, 35). The payments were to be made in the amount of $100,000 dollars within 30 days of the decree of dissolution, and a $100,000 payment on each of the following four anniversaries of the dissolution. *Id.* The agreement also obligated Husband to pay Wife $500 per week during the pendency of dissolution litigation, "in lieu of any and all other payments," as well as to allow Wife to occupy the marital abode for a period not exceeding 120 days

following the last day of the marriage. (Record, 36.)

At the time of the marriage, Husband was a successful businessman with a net worth of $31,432,000. During the marriage, Husband suffered financial reversals which ultimately resulted in his filing a petition for bankruptcy. Husband did not schedule Wife as a creditor in his bankruptcy proceedings, and, when Wife questioned him as to whether she needed to file a claim based upon the antenuptial agreement, he told her that the antenuptial agreement would not be affected by his bankruptcy. On January 8, 1990, Husband received a discharge under chapter 7 of the Bankruptcy Code.

On March 15, 1989, Wife filed the present petition for dissolution, "an equitable distribution of the property and debts of the parties," and attorney fees. Wife asked the court to enforce the antenuptial agreement as well as to provide her with rehabilitative maintenance. At the time of the hearing in December, 1989, Husband's net worth was $301,075, representing a decline of approximately $83,000 over the previous eight months. Husband had an annual salary of approximately $50,000. Husband is also the lifetime income beneficiary of a discretionary spendthrift trust which had provided him with substantial income in the past, but from which he had not received a disbursement since 1987. The trust properties had been refinanced and the trust had made significant expenditures in property rehabilitation. In addition, the trust was contesting a $7,000,000 lawsuit with the IRS. Husband also testified that he was defending lawsuits by four creditors who were objecting to the discharge of debts, and that if such lawsuits were decided unfavorably to Husband, he could be liable to those creditors for $10,000,000.

Wife was employed with Merrill Lynch at the time of the hearing. She was paid solely on a commission basis, and, as of the time of the hearing, she had not received any income from that job.

On April 20, 1990, the trial court entered its decree of dissolution accompanied by its findings of fact and conclusions of law. The court found that, contrary to Husband's assertions, the antenuptial agreement had not been discharged in Husband's bankruptcy proceedings for the following reasons:

The evidence shows that Petitioner was never listed as a creditor in the bankruptcy. Respondent argues that listing the Petitioner as a creditor would have created instability in the marriage, and in any event Petitioner had actual knowledge of the bankruptcy and was free to file a claim against the estate. By not filing a claim when she had actual knowledge of the bankruptcy, Respondent contends that the debt was discharged pursuant to Sec. 523(a)(3) of the Bankruptcy Code.

Two problems exist with this argument. First, the evidence differs as to whether the Respondent told the Petitioner that the bankruptcy would render the antenuptial agreement invalid. Petitioner indicates that the Respondent said the antenuptial agreement would not be effected [sic] by the bankruptcy because she was not listed as a creditor, and the Respondent testified that he told the Petitioner that the bankruptcy would render the antenuptial agreement invalid. The Court tends to believe the Petitioner's testimony because if the Respondent's testimony was true no greater instability to the marriage could occur simply by listing the Petitioner as a creditor; Respondent had already said the bankruptcy was invalidating the agreement. If the Respondent had misled the Petitioner by indicating that the bankruptcy would not effect the agreement, then the Petitioner was not actually "put on notice" that she had to file a claim.

Secondly, if listing the Petitioner as a creditor would create instability in the marriage, then surely filing a claim against the estate would have the same effect. If public policy relieves Respondent of the need to list his Wife as a creditor, then public policy relieves the Petitioner of having to file a claim against his estate.

(Record, 5–6). However, the court also stated that,

> [E]ven though the Court believes that Respondent's bankruptcy did not discharge Petitioner's right to payment pursuant to the antenuptial agreement, the drastic change which occurred regarding the Petitioner's [sic] financial condition now renders the agreement unenforceable, for to do so would be unconscionable. If the Court were to enforce the agreement, the Court would be awarding literally all of the marital assets to the Petitioner after a five year marriage which produced no children. This the Court cannot in good faith do.

(Record, 6).

The court divided the marital estate pursuant to Ind.Code § 31–1–11.5–11. The court found the net worth of the marital estate to be $506,155.17. It awarded Wife $335,080 out of the estate (approximately 66% of the estate).

■ Initially, we note that Wife requested special findings pursuant to Trial Rule 52(A). In such a case, the trial court is required to make complete special findings. *Dahnke v. Dahnke* (1989) Ind.App., 535 N.E.2d 172, 175. Special findings are complete if they are "sufficient to disclose a valid basis under the issues for the legal result reached in the judgment." *In re Marriage of Miles* (1977), 173 Ind.App. 5, 8, 362 N.E.2d 171, 174. We afford special findings a two-tier standard of review. First, we determine if the evidence supports the findings, and second, we determine if the findings support the judgment. If we conclude that the findings support the judgment and are not clearly erroneous, we will affirm the judgment. A judgment is clearly erroneous when a review of the record leaves us with a definite and firm conviction that a mistake has been made. *Dekalb County Eastern Community School District v. Dekalb County Eastern Education Association* (1987), Ind.App., 513 N.E.2d 189.

## ISSUE I

■ We first take up the issues related to whether or not the antenuptial agreement is enforceable. Husband claims that the antenuptial agreement is unenforceable because it was a debt discharged in his bankruptcy. Husband contends that the antenuptial agreement was a "debt" within the definition of that word in the Bankruptcy Code. According to Husband, Wife insists that the antenuptial agreement gives her a $500,000 "right to payment." Section 101(4) of the Code defines that "right to payment" as a "claim." Under that section the term "claim" is defined as

> [A] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured....

11 U.S.C.A. § 101(4) (1988). Husband quotes the official comments to section 101 to the effect that Congress intended the concept of "claim" to be given the

> broadest possible definition ..., that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.Rep. No. 595, 95th Cong.2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, at 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, 1978 U.S.Code Cong. & Admin.News, at 5807–5808. In turn, Section 101(11) defines "debt" as "liability on a claim." 11 U.S.C.A. § 101(11) (West 1991). According to Husband, Wife's claim therefore was discharged under section 727(b) which provides:

> Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter....

11 U.S.C.A. § 727(b) (West 1991).

There is a split in authority as to whether obligations that are not due and payable at the time of the filing of a petition for bankruptcy are dischargeable. In *Bush v. Taylor* (8th Cir.1990), 912 F.2d 989, a dissolution decree had awarded the wife one-half of husband's pension. The husband fell into serious arrears and the parties

executed an agreed judgment for the arrears along with an agreement that the wife would not execute the judgment. They also agreed to reduce the wife's share of the husband's pension payments to $500/month to be paid on the 15th of each month for the remainder of the husband's life. The husband filed for bankruptcy and the bankruptcy court did not discharge the monthly payments. The appellate court, in giving an alternate reason for its affirmance reasoned that, not until after the fifteenth of each month when a payment was due, but unpaid, did that portion of the obligation become a "debt" within the meaning of the Bankruptcy Code. 912 F.2d at 993. Accordingly, the post-petition pension payments to which the wife was entitled were not pre-petition debts dischargeable in bankruptcy.

The *Bush* court relied, in part, upon *Horton v. Beaumont Place Homeowners Association* (Bankr.D.Col., 1987), 87 B.R. 650. In *Horton*, the association filed suit in state court seeking to collect post-petition condominium assessments against the debtor. The court held that the association did not have a right to payment, and hence, a claim under 101(4)(A) until each monthly installment was due. *Id.* at 652. The court reasoned that a discharge under sections 727 and 524 operates only to extinguish personal liability of the debtor upon pre-petition debts, not a debtor's personal liability to a creditor in general. *Id.*

However, a line of cases has rejected the reasoning of *Horton* and *Bush* and adopted an interpretation identical to that urged by Husband in this case. *See, e.g. In re Ryan* (Bankr.N.D.Ill.,1989), 100 B.R. 411; *In re Elias* (N.D.Ill.1989), 98 B.R. 332. The court in *In re Ryan* noted that "debt" and "claim" are intended to be coextensive. 100 B.R. at 414. The court then explained that the Code defines the term "claim" to include contingent rights to payment and it quoted the definition of "contingent" from Black's Law Dictionary as "possible, but not assured, ... conditioned upon the occurrence of some future event which itself is uncertain or questionable." 100 B.R. at 415 (quoting BLACK'S LAW DICTIONARY 290 (5th ed. 1979)). Furthermore,

the court noted that Congress intended for the term "claim" to be given the "broadest possible definition." 100 B.R. at 414. The court found that the debtor's obligation to pay post-petition assessments arose from the pre-petition condominium agreement. The association's right to payment was contingent upon the happening of an uncertain future event, namely that the debtor would remain in possession of the condominium. Therefore, the post-petition assessments were discharged.

We find that the *Ryan/Elias* interpretation of "debt" is the more supportable interpretation under the Code. Therefore, unless otherwise excepted, Wife's claim under the antenuptial agreement was discharged.

Wife contends that the debt was excepted from discharge under § 523(a)(3) because she did not have notice of the need to file a claim. However that section provides:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(3) neither listed nor scheduled under section 521(1) of this title ..., in time to permit—

(A) ... timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing....

11 U.S.C.A. § 523(a)(3) (West 1991). That subsection plainly states that the failure to schedule debts will not except those debts from discharge if the creditor had actual knowledge of the *proceedings*. Courts almost uniformly recognize that the sections of the bankruptcy code dealing with discharge should be construed liberally to effectuate the policy of providing the debtor with a fresh start. *In re Marino* (N.D.Ind. 1983), 29 B.R. 797, 799. Wife cites no authority to support her reading of 523(a)(3). Wife does not dispute that she knew that Husband had filed a petition for bankruptcy. Because she had timely knowledge of the existence of the bank-

ruptcy proceedings, section 523(a)(3) does not except her claim from discharge.

■ However, the trial court found that the antenuptial agreement was not dischargeable in bankruptcy because Husband told Wife that she did not need to file a claim and that his bankruptcy would not affect the validity of the agreement. We read this to be a finding that Husband was estopped by his conduct to assert his discharge. We agree.

We note that the Bankruptcy Code implicitly recognizes the doctrine of equitable estoppel. Bankruptcy courts are courts of equity. 11 U.S.C.A. § 105 (West 1990); *In re Lake Winnebago Development Co., Inc.* (W.D.Mo.1985), 55 B.R. 1005, 1014. When deciding whether a debt has been discharged, we should be guided by the same equitable principles that govern bankruptcy courts. Such principles require us to keep in mind the policy of fairness to creditors as well as a fresh start for debtors. *In re Dan–Ver Enterprises, Inc.* (Bankr. W.D.Pa.1986), 60 B.R. 568, 570. In *Richardson v. Chrysler First Financial Services Corporation* (Bankr.M.D.Fla.1989), 102 B.R. 254, the court found that the debtor was equitably estopped from denying the validity of a reaffirmation agreement despite the fact that no reaffirmation hearings were held and section 524(d)(1) of the Code requires such hearings as a prerequisite to the enforceability of reaffirmation agreements.

In this case, Wife asked Husband about the effect his petition for bankruptcy would have on their antenuptial agreement. He assured her that the bankruptcy would have no effect on the agreement. The parties remained married following Husband's petition for bankruptcy. An integral part of the parties' marriage, inseparable from the marriage itself, was the antenuptial agreement. Wife clearly relied to her detriment on husband's oral representation that the agreement was still valid as well as upon Husband's conduct in treating the marriage as unaffected by the bankruptcy petition. Therefore, the key element of detrimental reliance on Husband's representations and conduct is supported

by the evidence. We hold that, on the unique facts of this case, the doctrine of equitable estoppel applies and we affirm the trial court's finding that Wife's claim under the antenuptial agreement was not discharged in bankruptcy. *Cf. Ryan* 100 B.R. at 416 (finding that if a debtor-condominium owner remains in possession of a condominium unit, the court will deem the condominium agreement not to be rejected, and debtor will be liable for otherwise dischargeable post-petition assessments).

The facts of this case illustrate the difficulty in applying the provisions of the Bankruptcy Code to an antenuptial agreement entered into before a spouse's bankruptcy, but under which the parties remain married after the spouse files for bankruptcy. The parties may remain married long after the petition for bankruptcy is filed. Enforcement of the agreement does not deplete the resources available to the other creditors, nor does it harm the debtor's fresh start. In fact, it arguably furthers the policy of giving debtor a fresh start by not weakening a foundation of the marital relationship.

### ISSUE II

Next, we address Wife's claim that the trial court erred by refusing to enforce the antenuptial agreement based upon the change in circumstances between the execution of the agreement and the dissolution. We find that the trial court committed error.

■ Indiana law favors antenuptial agreements. *In re Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 693. Such agreements are valid and binding so long as they are entered into freely, without fraud, duress, or misrepresentation and they are not, under the particular circumstances of the case, unconscionable. *Id.* In *Boren* our supreme court addressed the question of whether Indiana law distinguishes between the enforceability of antenuptial agreements that pertain to the rights and interests of the parties upon divorce and agreements that pertain to the rights and interests of the parties upon death. *Id.* The court found that Indiana

law does not make such a distinction. 475 N.E.2d at 694.

In reaching its decision, the *Boren* court responded to the wife's argument that IND.CODE § 31–1–11.5–10 precludes a trial court from being bound by an antenuptial agreement that purports to settle the rights and interests of the parties upon divorce. That section gives the trial court discretion to reject settlement agreements. The *Boren* court distinguished settlement agreements entered into as a consequence of dissolution proceedings and antenuptial agreements entered into in contemplation of marriage, and it found that I.C. § 31–1–11.5–10 applied only to the former. 475 N.E.2d at 695. The court specifically disapproved of *Tomlinson v. Tomlinson* (1976), 170 Ind.App. 331, 352 N.E.2d 785 to the extent that *Tomlinson* held that I.C. § 31–1–11.5–10 gave the trial court discretion whether to enforce antenuptial agreements. *Id.*

In *Tomlinson* the court addressed a similar question as that presented in *Boren*. The *Tomlinson* court held that antenuptial agreements conditioned upon the divorce or separation of the parties are not per se invalid. 352 N.E.2d at 791. The court qualified its holding saying:

> However, such an agreement is not binding upon the court. Since circumstances existent at the time of the divorce may be substantially different from those which existed at the time of the agreement, a valid agreement is but one factor to be considered among the several factors upon which the court customarily relies to make an equitable distribution of property [footnote omitted].

*Id.* In a footnote at the end of the above quoted passage, the court cited *Clark, Law of Domestic Relations* § 1.9 (1968) for the proposition that a substantial reason for the invalidation of antenuptial agreements is that provisions which are fair and equitable at the time they are made may not be so at the time of divorce. *Id.*

■ Wife urges the conclusion that a court may not examine a post-execution change in circumstances in determining whether to enforce an antenuptial agree-ment. We agree that a traditional application of the doctrine of unconscionability would not support the trial court's refusal to enforce the agreement in this case. As a general rule, a contract is unconscionable if there was a gross disparity in bargaining power which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms and the contract is one that no sensible person, not under delusion, duress or distress would accept. *Stech v. Panel Mart* (1982), Ind. App. 434 N.E.2d 97, 103. The doctrine of unconscionability necessarily looks to the time of execution. *See Weaver v. American Oil Co.* (1972), 257 Ind. 458, 462, 276 N.E.2d 144, 146 (referring to I.C. 26–1–2–302, which defines unconscionability in contracts for the sale of goods as existing at the time of the making of a contract).

■ In addition, Wife points out that *Boren* specifically overruled *Tomlinson* inasmuch as *Tomlinson* interpreted section 31–1–11.5–10 as giving a trial court discretion not to enforce an antenuptial agreement. *Tomlinson* based the grant of discretion to the trial court on grounds that circumstances at the time of the divorce may be substantially different from the circumstances that existed at the time of the execution of an antenuptial agreement. Wife argues that *Boren* therefore eliminated a trial court's discretion to rely upon post-execution changes in circumstances to invalidate an antenuptial agreement. We find that, in certain factual situations described below, a trial court may refuse to enforce an antenuptial agreement due to circumstances existing at the time of dissolution.

Husband cites cases from foreign jurisdictions in which courts have looked to circumstances at the time of dissolution in deciding the validity of antenuptial agreements. In *Newman v. Newman* (1982), Colo., 653 P.2d 728, the court considered whether an antenuptial agreement was unconscionable. *Id.* at 732. The court distinguished between antenuptial agreements providing for property division upon divorce and agreements providing for spousal maintenance upon divorce. 653 P.2d at

733–734. With regard to the former, the court found that such agreements are subject to a fairness review within the common law context for fraud, overreaching, or sharp dealing. Such analysis must focus on the time of execution, "for if the spouses have freely, and intelligently entered into a contract fixing their economic status should the anticipated marriage subsequently fail, the court should not substitute its judgment and amend the contract. . . ." 653 P.2d at 734.

The *Newman* court reached a different conclusion with reference to provisions for spousal maintenance. The court found that such provisions may become voidable as unconscionable due to circumstances existing at the time of dissolution. *Id.* The court arrived at that conclusion by considering, among other things, the policy expressed in the Uniform Dissolution of Marriage Act, which corresponds closely to the wording of the counterpart Colorado statute. *Id.* The court found that one of the purposes of the act is to mitigate potential harm to a spouse occasioned by dissolution. The health and employability of a spouse may have deteriorated to the extent that to enforce the maintenance provisions would result in the spouse becoming a public charge. *Id.* The court noted that the section of the Act covering the division of property authorized the trial court to divide marital property, *except* property excluded by valid agreement. The section regarding maintenance authorized the trial court to order maintenance in accordance with specified factors, but did not provide a similar exception for antenuptial agreements.

The court concluded that:

> [O]ne who claims that an antenuptial maintenance agreement is unconscionable must prove that at the time of the marriage dissolution the maintenance agreement rendered the spouse without a means of reasonable support, either because of a lack of property resources or a condition of unemployability.

653 P.2d at 736. The court then applied the statutory criteria regarding maintenance to decide if the agreement was unconscionable in relation to the reasonable maintenance needs of the wife as of the date of dissolution. The court found that the agreement, which provided that there would be no maintenance, was not unconscionable where the wife completed her college education during the marriage and was earning $1500 a month at the time of the dissolution.

In *Lewis v. Lewis* (1988), 69 Haw. 497, 748 P.2d 1362, the Supreme Court of Hawaii expressed a similar policy—that it is in the best interest of the state that the financial well-being at the time of divorce be preserved by taking into account factors arising throughout the marriage in determining whether *support* provisions of an antenuptial agreement are unconscionable. Furthermore, *MacFarlane v. Rich* (1989), 132 N.H. 608, 567 A.2d 585 does not make a distinction between provisions for maintenance and property division. The court in that case held that a trial court may invalidate an antenuptial agreement due to a change in circumstances such that enforcement of the agreement would result in one spouse becoming a public charge. *Id.*, 567 A.2d at 591. The court noted the tension between ensuring predictability of wealth distribution and the court undertaking a post-execution review, but it found that, where the status of a spouse would change so dramatically as the result of enforcement of the agreement that the spouse would become a public charge, the state's interest in protecting the welfare of the spouse and in mitigating the hardship occasioned by a division justifies "complete judicial reformation of the contract." *Id.*

*Boren* clearly does not grant the trial court discretion regarding whether to enforce antenuptial agreements. However, *Newman*, *MacFarlane*, and *Lewis* stand for the proposition that a court may decline to enforce an antenuptial agreement, but only where enforcement would leave a spouse in the position where he would be unable to support himself. At that point, the state's interest in not having the spouse become a public charge outweighs the parties' freedom to contract. *Boren* implicitly recognizes such a policy. This is especially true in light of the fact that *Boren* cites *Newman* to support the propo-

sition that antenuptial agreements in contemplation of dissolution should not be treated differently from such agreements in contemplation of death as long as the same tests for validity are met. *Boren*, 475 N.E.2d at 694. *Newman* allows courts to look to circumstances at the time of dissolution under the umbrella of "unconscionability" which is one of the tests specifically recognized by *Boren*. In addition, the fact that *Boren* does not specifically include the public policy exception outlined above as a means to invalidate an antenuptial agreement does not mean that *Boren* forbids such action by a trial court.

■ The next question is whether a trial court may look to the circumstances at the time of dissolution in deciding the enforceability of property division provisions or whether it may only do so in the case of provisions regarding maintenance. The agreement in this case contains a clause stating that it does not apply to matters of spousal maintenance.

IND.CODE § 31-1-11.5-11 governs the disposition of property and the award of maintenance in a dissolution proceeding. Subsection (c) establishes a rebuttable presumption that an equal division of the marital property is just and reasonable. That subsection lists a number of nonexclusive factors which a court may consider in deciding whether the presumption has been rebutted:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance of gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in that residence for such periods as the court may deem just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties.

Although providing for the post-dissolution support of the spouses is not the sole concern of property disposition under the statute, I.C. § 31-1-11.5-11(c)(3) and (5) demonstrate that it is an important concern of property disposition. Therefore, we should not distinguish between provisions for property division and maintenance with regard to a trial court's ability to consider circumstances at the time of dissolution in deciding whether an antenuptial agreement is valid. *See* 2 Clark, *The Law of Domestic Relations in the United States* 52 (1987) (Citing *Newman* and other cases that make such a distinction and saying that the distinction appears essentially impossible because, in most states, the purpose of property division and maintenance is the same—providing for the future support of the obligee spouse). If an antenuptial agreement dividing property between the parties would leave a post-dissolution reality in which one spouse would not have sufficient property to provide for his reasonable needs, then the court may refuse to enforce the antenuptial agreement.

■ The trial court did not base its finding of unconscionability upon Husband's ability to support himself as evidenced by the following:

[t]he drastic change which occurred regarding the Petitioner's financial condition now renders the agreement unenforceable, for to do so would be unconscionable. If the Court were to enforce the agreement, the Court would be awarding literally all of the marital assets to the Petitioner after a five year marriage which produced no children. This the court cannot in good faith do.

(Record, 6.) The evidence supports the trial court's findings that Husband suffered drastic financial reversals, the marriage produced no children, and enforcement of the antenuptial agreement would result in the award of all the marital assets to Wife. However, those findings do not support the court's refusal to enforce the antenuptial

agreement. The court did not make any finding regarding Husband's ability to support himself if the antenuptial agreement were to be enforced. The judgment of the trial court is therefore clearly erroneous. *See Dekalb County Eastern Community School District*, 513 N.E.2d at 191.

Husband also claims that the contract is unenforceable because the parties did not contemplate such a dramatic reversal in Husband's financial fortunes, and, therefore, there was no meeting of the minds with regard to application of the agreement under these particular circumstances. We disagree.

 The parties agreed to a division of property upon the happening of an event in the future. By setting out a specific amount of "alimony," Husband accepted the risk that the stated amount might represent a larger share of his net worth at the time for performance than was the case at the time of execution. The drastic financial reversal that Husband suffered was a foreseeable event. Even if it were not foreseeable, Husband would not be relieved from his obligations. Husband essentially argues that the purpose of the contract was frustrated by the reduction of his wealth. However, Indiana does not recognize the doctrine of frustration of purpose. *Ross Clinic, Inc. v. Tabion* (1981), Ind. App., 419 N.E.2d 219, 223.

 On remand, the trial court will have to consider the facts that bear upon Husband's ability to support himself if the antenuptial agreement is enforced. Among the relevant factors are Husband's $50,000 annual salary and future earning potential, his substantial assets pursuant to the property division under the antenuptial agreement, the size of the debt created by the alimony provisions of the agreement, and his existing liabilities. We emphasize that the standard is stringent and the hardship contemplated must rise above a drastic alteration in Husband's accustomed standard of living to threaten Husband's very ability to provide for himself. We also note that the trial court will need to consider the fact that, although the debt is payable annually in increments of $100,000,

the court is not being asked to specifically enforce the payment schedule.

## ISSUE III

 Husband claims that, even if the agreement was not discharged in bankruptcy or unconscionable, it was otherwise unenforceable on grounds of estoppel. Husband claims that Wife has demonstrated that she did not feel bound by the agreement's limitations, and she is therefore estopped from asserting its validity solely with respect to the provision for payment of the $500,000. Husband relies upon Wife's petition for dissolution in which he claims Wife requested benefits inconsistent with the provisions of the antenuptial agreement and upon an Agreed Provisional Order under which he claims that Wife also received benefits inconsistent with the antenuptial agreement. However, the doctrine of estoppel is not applicable here.

Husband relies upon *In re Estate of Palamara* (1987), Ind.App., 513 N.E.2d 1223. In that case, the wife attacked the validity of an antenuptial agreement which, upon the death of her husband, provided her with an income of $1000 per month in lieu of her statutory allowance. The trial court found that the wife had used the money distributed to her under the agreement and therefore it enforced the agreement. The appellate court affirmed saying:

> In this state, a party may not accept benefits under a transaction or instrument and at the same time repudiate its obligations [citation omitted]. A party to an agreement is confined to the position which he first adopts unless he annuls that election by restoring the benefits received [citations omitted].

*Id.* at 1228. Here, Wife does not attempt to *contest* the validity of the agreement, rather she *relies* upon its validity and Husband does not claim that she is estopped because she had retained benefits under the agreement, but because she had repudiated the agreement.

Estoppel is an affirmative defense. Ind.Trial Rule 8(C). As such, Husband had the burden to demonstrate that Wife had repudiated provisions contained in the ante-

nuptial agreement. The trial court did not make any specific finding with regard to estoppel despite the fact that Husband raised the issue both in cross-examination of Wife and in his post-trial brief. However, the issue of whether Wife repudiated the antenuptial agreement is not a factual question in this case because Husband relies exclusively upon the Agreed Provisional Order and Wife's petition for dissolution. We hold that, as a matter of law, those documents do not estop Wife from asserting the validity of the antenuptial agreement.

With regard to the benefits that the wife received under the Agreed Provisional Order, husband has not demonstrated how Wife repudiated the antenuptial agreement. The Agreed Provisional Order states:

> Patricia Ann Justus ("the Wife") having filed herein her petition for preliminary hearing and temporary maintenance and the parties having signified their agreement to the following provisional order by their signatures appearing at the end hereof, the Court, being duly advised, now enters the following order....

(Record, Supplemental Trans., 5.) This is not a situation where Husband sought to enforce the antenuptial agreement and Wife asserted that the agreement was invalid. Rather, the parties agreed that Wife would receive certain benefits, in excess of or addition to, those provided for in the antenuptial agreement. Parties are free to *agree* to modify an agreement in part without disavowing the validity of the agreement in its entirety. *Foltz v. Evans* (1943), 113 Ind.App. 596, 613, 49 N.E.2d 358, 365.

Furthermore, Wife's requests for an "equitable division of property," and attorney's fees did not estop her from seeking to enforce the antenuptial agreement. Those requests were not inconsistent with, and did not represent a repudiation of, any part of the antenuptial agreement. Husband does not contest that, if the agreement were not enforceable, the trial court would be required to make an equitable property distribution and could award attorney fees. Wife did not ask the trial court to enforce the part of the antenuptial agreement and then make an equitable property distribution in contravention of other provisions of the contract. Her requests were not necessarily contradictory. This case is unlike *Hughes Masonry v. Greater Clark County School Building* (7th Cir.1981), 659 F.2d 836, relied upon by Husband. In *Hughes,* a party adopted clearly contradictory positions. A masonry company involved in a school construction project asserted, in support of its claim for damages, that the project manager was a party to a contract between the masonry company and the school building. However, in defense of the school building's motion to compel arbitration under the contract, the masonry company asserted that the manager was not a party to the very same contract. The court held that the masonry company was estopped from asserting that the manager was not a party to the contract. *Id.* at 839.

Likewise, Wife's request for rehabilitative maintenance cannot operate to estop her from asserting the validity of the antenuptial agreement. It is true that, unlike her requests for an equitable property division and attorney's fees, she asked for rehabilitative maintenance *in addition to* her claim under the antenuptial agreement. It is also true, as we explain in our discussion of Issue IV *infra,* that the agreement precludes an award for rehabilitative maintenance. However, even if we were to equate her request for maintenance with an intentional denial of the validity of the antenuptial agreement, we must still find that she was not estopped from relying upon the agreement. Wife did not request rehabilitative maintenance until after she had asked the court to enforce the antenuptial agreement. Under *Palamara* a party is confined to the position which she first adopts.[2]

**2.** Husband does not claim that Wife is estopped from requesting rehabilitative maintenance, and we do not address that issue.

Furthermore, Wife's request for rehabilitative maintenance could not be interpreted as an intentional repudiation of the agreement. When counsel pressed her on cross-examination regarding whether she wanted rehabilitative maintenance in addition to the "alimony," she responded, "I don't understand the law ... If I'm entitled to rehabilitative maintenance, yes." (Record, 106.) For these reasons, we hold that Wife was not estopped from asserting the validity of the antenuptial agreement.

## ISSUE IV

■ Finally, we turn to Wife's claim that the trial court committed error because it did not make any findings upon her request for rehabilitative maintenance. Wife filed a request for special findings under T.R. 52(A). Where a party requests special findings, the court is required to make complete special findings. *Dahnke v. Dahnke* (1989), Ind.App., 535 N.E.2d 172, 175. During the course of the trial, Wife clearly requested rehabilitative maintenance and the issue was tried by consent. *See Terre Haute Regional Hospital, Inc. v. El–Issa* (1984), Ind.App., 470 N.E.2d 1371, 1374. The trial court did not mention rehabilitative maintenance in its findings or judgment. However, if on remand, the trial court, upon consideration of the proper standard regarding unconscionability, enforces the antenuptial agreement, the terms of the agreement will preclude the award of rehabilitative maintenance and findings will be unnecessary. The integration clause of the agreement provides:

12. *Entire Agreement.* This Antenuptial Agreement contains the entire understanding and agreement of the Parties. No representations, warranties, promises, covenants or undertakings, oral or otherwise, other than those expressly stated herein, have been made. This agreement shall not apply to matters of spousal maintenance or claims premised upon a mental or physical impairment that materially affects the ability of the impaired person to provide for himself or herself. Such matters, if they should arise, shall remain at issue and shall be determined by a court of competent juris-

diction having due regard for the provisions made hereunder for each spouse. (Record, 43.) The agreement precludes an award for anything other than "spousal maintenance or claims premised on physical or mental impairment." Because there is no question of impairment in this case, the issue is whether the term "spousal maintenance" includes rehabilitative maintenance.

In interpreting a written contract, a court must attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Donnelley & Sons, Co. v. Henry–Williams, Inc.,* (1981), Ind.App., 422 N.E.2d 353, 356. The meaning of a contract is a matter of law where the terms of the contract are clear. *Piskorowski v. Shell Oil Co.* (1980), Ind. App., 403 N.E.2d 838, 844. Where a contract is ambiguous, its meaning may or may not be a question of law. If an agreement is "ambiguous or uncertain in its terms and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the fact finder.... If, however, the ambiguity arises because of the language used in the contract and not because of extrinsic facts, and its construction is purely a question of law...." *Donnelley & Sons,* 422 N.E.2d at 356. Ambiguity exists where reasonable people would find the terms of the contract susceptible to more than one interpretation. *Piskorowski,* 403 N.E.2d at 844.

At the time the parties signed the antenuptial agreement, Indiana law did not provide for rehabilitative maintenance. Rehabilitative maintenance was added to the statutory scheme effective on July 1, 1984. Ind.Acts P.L. 150–1984. Prior to that date, a court could only award spousal maintenance if it found a spouse to be "physically or mentally incapacitated to the extent that the ability of such incapacitated spouse to support himself or herself is materially affected." I.C. § 31–1–11.5–9 (1982). The parties specifically contracted to have Indiana law apply in construction of the agreement. It is therefore reasonable to construe the term "spousal maintenance" to embody the specific meaning given to it

by the statutory scheme as it existed at the time the parties executed the agreement. However, it is also reasonable to assume that the parties intended the term to encompass more due to the use of the disjunctive in excepting "spousal maintenance *or* claims premised upon a mental or physical impairment."

This ambiguity arises solely from the language employed, and a reading of the contract as a whole reveals that the parties did not intend to allow the possibility of a court award for the interruption in Wife's employment or compensation for the differential in their earning capacities pursuant to the provision for rehabilitative maintenance contained in I.C. § 31–1–11.5–11(e)(3). The agreement demonstrates the parties' intent to allow Husband to retain the substantial assets he brought into the marriage or acquired in his own name during the marriage while providing Wife with financial security and compensation for her marital sacrifices in the event of dissolution. This is particularly demonstrated by the graduated increase in the alimony provisions according to the length of the marriage. We therefore find that, if the trial court enforces the antenuptial agreement on remand, Wife is precluded from receiving rehabilitative maintenance as a matter of law.

■ However, if the trial court does not enforce the agreement due to a finding of unconscionability based upon proper factors, it should make a factual finding regarding rehabilitative maintenance. Husband contends that a remand upon this issue would offend the principle of judicial economy because the trial court's omission of specific findings regarding rehabilitative maintenance was merely a "technical" error. Husband correctly asserts that the purpose of special findings is to disclose a valid basis under the issues for the legal result reached in the judgment. *In re Marriage of Miles* (1977), 173 Ind.App. 5, 8, 362 N.E.2d 171, 174. Husband cites *Hatcher v. Graddick* (1987), Ind.App., 509 N.E.2d 258 for the proposition that, where the essential facts are not in dispute and the bases for the trial court's decision can be easily determined, no purpose would be served by remanding the cause for special findings. *Id.* at 259.

Trial courts are vested with broad discretion in deciding whether to award rehabilitative maintenance and are thus privileged to act in accord with what is fair and equitable. *Dahnke*, 535 N.E.2d at 174. Husband essentially claims that the facts are not in dispute and, as a matter of law, lead only to the conclusion that Wife is not entitled to rehabilitative maintenance. We disagree.

IND.CODE § 31–1–11.5–11(e) provides four factors that the trial court must consider in deciding whether to award rehabilitative maintenance. Two of the listed factors are:

(B) whether an interruption in the education, training, or employment of a spouse who is seeking maintenance occurred during the marriage as a result of homemaking or child care responsibilities, or both;

(C) the earning capacity of each spouse, including educational background, training, employment skills, work experience, and length of presence in or absence from the job market. . . .

In the present case, the evidence revealed that Wife quit her job at the urging of Husband. In addition, Husband was earning approximately $50,000 at the time of the hearing, and, after an exhaustive search Wife had only managed to land a straight-commission job from which, at the time of the hearing, she had not received any income. Although the facts regarding the spouses' relative incomes and the property settlement may not be in dispute, they support conflicting reasonable inferences regarding whether an award of rehabilitative maintenance would be equitable. *Hatcher* does not control this case because the basis for the trial court's denial of rehabilitative maintenance is not clear.

In sum, we find that the trial court was correct in finding that husband was estopped to claim that the antenuptial agreement was discharged, but erred in finding that the antenuptial agreement was unenforceable as unconscionable. The

antenuptial agreement was not otherwise unenforceable by Wife due to estoppel or discharge in bankruptcy. On remand, the trial court must determine whether the agreement was unconscionable in accordance with the standard outlined in this opinion. If the trial court finds that the agreement is not enforceable, it must make an equitable property division in accordance with the statute and make a factual finding regarding rehabilitative maintenance. We therefore affirm in part, reverse in part, and remand to the trial court for proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

BAKER, J., concurs.

BARTEAU, J., concurs in result.