### Stratton, Administrator, et al. v. Wilson.

(Decided May 9, 1916.)

#### Appeal from Oldham Circuit Court.

1. Husband and Wife—Antenuptial Contract—Alimony—Public Policy.—An antenuptial contract providing for the payment of alimony upon separation and obtaining a divorce by the parties contemplating marriage, is against public policy and void.

2. Contracts—What Contracts Courts Will Not Enforce.—If the consideration for a contract be partly legal and partly illegal, the courts will not enforce a promise based upon it, as the illegal part of the consideration vitiates the entire contract and renders it unenforceable; but if several promises, some of which are legal

and some illegal, be all based upon one entire consideration which is legal, the law will enforce the legal promise while denying relief in proceedings to enforce the illegal promises.

3. Husband and Wife—Antenuptial Contract.—Marriage is the primary consideration for promises made in an antenuptial contract, and when some of such promises are legal while others are illegal, the former will be enforced regardless of the illegality of the latter.

4. Husband and Wife—Antenuptial Contract.—Where in an antenuptial contract it was stipulated that the prospective wife should be paid upon the death of the prospective husband the sum of $25,000.00; and it was further stipulated that in case the parties separated and obtained a divorce from each other, the husband would pay his wife the sum of $10,000.00 in lieu of all alimony, the promise to pay the alimony, although illegal, will not render that part of the contract to pay $25,000.00 in lieu of all interest in his estate, illegal.

5. Husband and Wife—Antenuptial Contract.—Although there may be an antenuptial contract between husband and wife, this will not deprive the widow of the right to occupy the homestead until such time as the estate may be distributed and settled.

6. Executors and Administrators—Allowance for Services.—Courts should exercise a reasonable discretion in making allowances to personal representatives and their attorneys, but where personalty is distributed in kind, the allowances should not be as much as where the assets are collected, debts paid, and other labors performed by the administrator in looking after and winding up the estate. In each instance the representative and his attorney should be allowed a reasonable compensation for the services performed, and the judgment of the court in fixing these allowances will not be disturbed on appeal unless there has been a plain abuse of discretion upon the part of the trial court.

7. Executors and Administrators—Allowance for Services.—The facts of this case examined and considering the amount of the property involved and the services rendered, an allowance to the personal representative of $6,055.00, and to her attorney a fee of $1,000.00 were not excessive.

ALEXANDER SCOTT BULLITT, WILLIAM MARSHALL BULLITT and KEITH L. BULLITT for appellants.

DAVID & DAVIS and D. H. FRENCH for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming on appeal and cross-appeal.

The questions presented for determination on this appeal grow out of litigation to settle and distribute the estate of Wilton A. Stratton, who died intestate on October 18, 1913, at Los Angeles, California, but domi-

ciled at the time in Oldham county. Previous to 1912, the decedent had lived for a great number of years in the city of Louisville, and in the spring of that year he purchased a country home near Crestwood, in Oldham county, where he made his home for the rest of his life. He was married to the appellant, who was then Miss Julia Eschmann, on February 24, 1913, the wedding taking place in the city of New York. On the 18th day of February preceding the marriage, the parties signed and executed the following contract, omitting signatures:

"THIS AGREEMENT made and entered into this 22d day of February, 1913, by and between Wilton A. Stratton, party of the first part, and Julia Eschmann, party of the second part, both of Oldham county, in the State of Kentucky.

"WITNESSETH: That whereas the said first and second parties are about to enter into a contract of marriage, and whereas it is desired between them to settle and adjust all property right or claims between them arising out of said proposed marriage, and whereas the said party of the first part, Wilton A. Stratton, wishes to make provision for said Julia Eschmann in lieu of dower or distributive share of his estate, both real and personal, and whereas said parties have agreed between themselves upon a provision for said second party, Julia Eschmann, and she has agreed and binds herself to accept same in lieu of any and all claims upon the estate of said Wilton A. Stratton during his life, or after his life should he die before her.

"Now, THEREFORE, this contract and agreement between said Wilton A. Stratton, party of the first part, and Julia Eschmann, party of the second part.

"WITNESSETH: That the said Wilton A. Stratton hereby agrees and binds himself, his heirs, administrators and assigns to pay to the said Julia Eschmann upon his death, if she survives him, she then being his wife, the sum of twenty-five thousand ($25,000.00) dollars out of his estate in full settlement of any and all claims of dower or distributable share of said estate, real and personal, and should said Julia Eschmann die before said Wilton A. Stratton, then nothing shall be paid to her heirs, executors, administrators or assigns, and he further binds himself that if at any time after the solemnization of said marriage, he and said Julia Esch-

mann should become separated or divorced, he will pay to her upon such divorce being obtained by either of them the sum of ten thousand ($10,000.00) dollars in full of any and all claims said Julia Eschmann might hold against him for alimony, or maintenance, or attorneys' fees in any such divorce proceedings.

"The said Julia Eschmann agrees to accept said sum of twenty-five thousand ($25,000.00) dollars upon the death of said Wilton A. Stratton in full settlement of any and all claims she might have as his widow for dower or distributable share of his estate, or should she become divorced from him at any time to accept said sum of ($10,000.00) dollars above set forth in full settlement of any and all claims for alimony or maintenance, or attorneys' fees.

"Said Wilton A. Stratton furthermore agrees and binds himself during the continuance of the marital relationship between him and the said Julia Eschmann to provide for her a good and comfortable living, so long as she lives and resides with him, but should she abandon him for any reason and refuse to live with him, then his responsibility from the time of said abandonment or refusal to live with him shall be limited to the sum of ten thousand ($10,000.00) dollars above provided for, and only upon the conditions there provided for the payment of said ten thousand ($10,000.00) dollars.

"IN TESTIMONY WHEREOF, witness the signatures of said first and second parties, the day and year above written."

The contract was executed in duplicate but each party was not delivered a copy until the day they left Louisville for New York, which was the 22nd of February; and thus, although the contract had been signed by each of them on the 18th, it bears the date of actual delivery.

Briefly stated, the circumstances under which the marriage was agreed to and the contract executed, are these: Neither party had ever been married. Mr. Stratton was about 62 years old and Miss Eschmann about 52 years old. She was then and had for some considerable time immediately previous, been employed by Mr. Stratton as housekeeper at a salary of $35.00 per month. He was not in the best of health and to regain and repair it he concluded to take a trip abroad.

He seems to have become very much pleased with the services of Miss Eschmann, not only as a housekeeper but in her attentions to his personal welfare as well, and he desired that she attend him upon his contemplated trip. To avoid any grounds for suspicion or scandalous gossip, he conceived the idea of marrying Miss Eschmann before starting on the trip and suggested it to his cousin and personal friend, Edward T. Farmer, but at the time stated that he would be unwilling to enter into the marriage unless there could be an understanding between himself and Miss Eschmann as to property rights growing out of the marriage. The deceased at that time was worth something like $230,-000.00, thirty thousand dollars of which was real property situated in Jefferson and Oldham counties, and the remainder was personal property, almost the entire portion of which consisted of solvent bonds and corporation stock, each being a well-paying investment.

The first conversation with Farmer concerning the proposed marriage occurred about February 7, of that year, and the subject was further discussed between them some four or five days thereafter. On the 17th day of February the matter was discussed by the three, Stratton, Farmer, and Miss Eschmann, and the terms of it, as afterwards incorporated into the writing, were each and all agreed to and the writing drawn up and subscribed by the parties the next day as we have stated, but not delivered until the 22nd. The attorney who drafted the contract, Mr. John J. Davis, realizing that Miss Eschmann should be apprised of the extent of the property of her contemplated husband, went to the home of Mr. Stratton on the 19th day of February, and there fully informed her of the amount of the property which Mr. Stratton owned; and, as the attorney states, of her rights in and to such property as surviving widow. To this she replied: "I didn't know that he had so much or that I was entitled to so much," whereupon the attorney replied: "Well, you know it now. The marriage has not been consummated and there is nothing that you couldn't withdraw from at this time," whereupon she replied, "It is too late. I have already signed the contract. I signed too quick." The marriage was afterwards consummated as we have stated, and the trip abroad was made lasting until some time in October.

Upon their return they did not come direct to their home but proceeded to the city of Chicago, where a stop of a few days was made, after which they went to Los Angeles, California, where, on October 18, the death of the husband occurred. The only heir at law of the decedent is the appellee, Mrs. Ada Stratton Wilson, who is the only child of a brother of the deceased. After the death of her husband, the appellant as his widow, returned to the Crestwood home and has since occupied it, in the meantime qualifying as the administratrix of the estate of her deceased husband.

The litigation in which the judgment was rendered from which the appeal is prosecuted, consists of several separate suits and proceedings concerning the estate, all of which were consolidated in the court below, and for the purpose of this opinion, it is not necessary that they be either separately stated or noticed. The chief controversy between the parties and the storm center of this litigation is, as to the validity of the antenuptial contract which we have herein copied, the widow contending that she is not bound by it, and that she is therefore entitled to her distributable share of her husband's estate as though no contract was made; while the heir is insisting that the contract is valid, and was at the death of the decedent in full force, and the widow is, therefore, entitled to but $25,000.00, the amount named in the contract. This latter view is the one taken by the trial court, and from the judgment so holding the widow has appealed.

In the court below there were three grounds urged by the widow as to why the contract is not binding upon her, they being: (1) That the contract is void on its face; (2) that before signing it she was not aware of the value of the estate of her future husband, and that she was therefore induced by this fraudulent concealment to place her name to it and to agree to its terms, and, (3) that the contract after their marriage was orally rescinded by herself and her husband before his death.

We will consider these in the reverse order. As to the third ground stated, without passing on the question as to whether this character of contract can be orally rescinded, it is sufficient to say that there is no evidence of any character of a rescission, except the testimony of the widow, which is manifestly incompetent under section 606 of the Civil Code of Practice.

This is so apparent that counsel for her did not mention it in the argument of the case, nor does he refer to it in his brief. We, therefore, do not deem it necessary to give this contention further consideration.

As to the second ground urged against the contract, it cannot be denied but that it is the settled rule that the prospective wife, in contracts of this character, in order to be bound thereby, should, before entering into the contract and at that time, be apprised "of the nature and extent of her prospective husband's estate and the value of her marital rights therein which she by its terms is surrendering." Tilton v. Tilton, 130 Ky., 281. Other cases in point are: Daniels v. Banister, 146 Ky. 48; Redwine v. Redwine, 160 Ky. 282, and Gaines v. Gaines, 163 Ky. 260. These cases very properly hold that such a contract to be binding on the prospective wife must be free from fraud, misrepresentation, deceit or concealment; but they do not go farther than this. The fact that the contract had been signed before the appellant had been placed in possession of all the facts, cannot militate against the validity of the contract, provided all the facts were freely and fairly stated to her before the marriage was consummated. Up to that time nothing had occurred to which any of the provisions of the contract could attach, and all that was necessary for the status of the parties to remain as it was then, was a refusal to marry. It was not necessary, even that the signed contract providing for the payment of alimony, should be destroyed. Appellant by her action, in subsequently marrying the deceased, plainly manifested her willingness to accept the provisions of the contract, and this, too, after she had been informed as to the extent of her prospective husband's estate, as well as what would be her rights as his widow if no contract was entered into. This, we conclude, effectually disposes of the second contention.

The first ground urged against the validity of the marriage contract presents a more serious question and will require from us a more extended consideration. This contention is based upon the insistence of counsel for appellant that all of that portion of the contract providing for the payment of alimony, should a separation of the parties occur after marriage, followed by a divorce, is absolutely void, and that this void stipulation invalidates the entire contract. At the threshold

it may be conceded, and indeed is conceded by counsel for appellee, that the stipulation as to alimony *is* void, as the law will not permit parties contemplating marriage to enter into a contract providing for, and looking to, future separation after marriage. This principle of law appears to be well settled and is supported by an unbroken line of authorities. Those from this court are: Gaines v. Poor, 3 Met., 503; Loud v. Loud, 4 Bush, 453, and Evans v. Evans, 93 Ky. 510.

The rule so announced is but a manifestation of a long settled policy of the law, to the effect that it is beneficial to society that the marital relation should not be disturbed or its happiness marred, but that it should be upheld and encouraged, and that the parties to it should not be led into the breaking of its vows by the allurements of any stipulations which they may enter into before marriage. So the question is: What effect does the stipulation as to alimony, which is conceded to be void, have upon the other stipulation for the payment of $25,000.00 upon the death of the husband, in lieu of all other interests of the widow which she would otherwise obtain from his estate, and which stipulation is conceded to be valid?

The rule is, if there is a single promise based upon a single consideration and both of them are void, the contract is wholly unenforceable; but where the consideration is valid, and *several* promises are based upon it, some of which are legal and others illegal, so that they may be separated, the legal ones will be enforced while those which are illegal will not, and the illegality of the latter will not prevent the enforcement of the former. So, in Volume 9, Cyc. 564, we find it stated:

"Where an agreement founded on a legal consideration contains several promises or a promise to do several things, and some only of the things to be done are illegal, the promises which can be separated, or the promise so far as it can be separated, from the illegality, may be valid. The rule is that a lawful promise made for a lawful consideration is not invalid merely because an unlawful promise was made at the same time and for the same consideration. Thus if the terms of a contract in restraint of trade can be construed divisibly as to the limits, it may be valid as to the limits which are reasonable, although other limits imposed are excessive, unreasonable and void."

This court has approved the text in the following cases: Brown v. Langford, 3 Bibb 497; Swan v. Chandler, 8 B. Mon. 97; Collins v. Merrell, 2 Met. 163; Kimbrough v. Lane, 11 Bush 556; Averbeck v. Hall, 14 Bush. 505; Bugg v. Holt, 29 Ky. L. R. 1208; McLane v. Dixon, 30 Ky. L. R. 683; Smith v. Corbin, 135 Ky. 727; Newport Rolling Mills Co. v. Hall, 147 Ky. 598.

A few references to what this court said in some of the cases referred to will serve to illustrate the rule as adopted in this State. In the Kimbrough case, it is said: "And it is equally well settled that if any part, however small, of the entire *consideration* of a contract be vicious, the whole contract is void." And in the Averbeck case, it is said: "It is well established that if a contract, the *consideration* of which is an agreement to impede, hinder or defeat the administration of the criminal or penal laws, is void as against public policy. It does not avail that, in this instance, there is a sufficient consideraton, independent of this vicious agreement, to support the contract. A part of the entire consideration being vicious, the whole contract is void." In the still later case of. Newport Rolling Mill Co. v. Hall, *supra,* this court quoting with approval from other of the cases, *supra,* said:

"The general rule is that if the obnoxious feature of a contract can be eliminated, without impairing its symmetry as a whole, the courts will be inclined to adopt this view as the one most likely to express the intention of the parties; but if the good and bad are so interwoven that they cannot be separated without altering or destroying the general meaning and purpose of the contract, the good must go with the bad and the whole contract be set aside. In Smith v. Corbin, 135 Ky. 727, it is said:

" 'In other words, it is a well known rule of law that where there are contained in the same instrument distinct engagements or covenants, by which a party binds himself to do certain acts, some of which are legal and some illegal, the performance of those which are legal may be enforced, although the performance of those which are illegal may not.'

"In Brown v. Langford, 3 Bibb. 497, the court said:

" 'Where there is a condition or covenant to do several things, a part of which is against the common law and the rest lawful, the condition or covenant will be

void as to so much as is unlawful, and good for the residue. But this does not hold where a part of the consideration is unlawful. There is no question but that a promise founded upon several considerations, one of which is vicious, is void; and the same principle requires that a covenant should be held to be so if the consideration be in part affected with turpitude.' To the same effect is McLane v. Dixon, 30 Ky. Law Rep., 683; Averbeck v. Hall, 14 Bush 505; Collins v. Merrell, 2 Met. 163; Swann v. Chandler, 8 B. Mon. 97.

"We are disposed to the view that this contract may be treated as a severable one, and that the objectionable clause may be stricken from it without affecting the validity of the remainder of the contract. The clause in question does not particularly concern the consideration specified in the contract, and it is generally in reference to contracts in which a part of the *consideration* is illegal that the courts have ruled that the entire contract was tainted. Where a part of the consideration upon which the contract rests is vicious, the courts as may be seen from the cases cited will not undertake to separate the good consideration from the bad, but will discard it as a whole."

It then becomes necessary to determine what constitutes the *consideration* for the two promises made by the prospective husband and found in this marriage contract. The two promises being, to pay the appellant in the event of a separation and divorce the sum of $10,000.00 in lieu of all alimony, and to pay her $25,-000.00 in the event of the death of her prospective husband in lieu of all interests in his estate. That the *marriage* was the *consideration* for these two promises, there can be room for but one opinion. In volume 21 Cyc., page 1246, it is said: "Marriage is a good consideration for antenuptial settlement of property on the intended wife. It has been said indeed that it is not only a valuable consideration, but a consideration of 'the highest value.' " This text is supported by numerous authorities from almost every State in the Union and in England, as well as by many text-writers upon the subject. The cases from this court so holding are: Forwood v. Forwood, 86 Ky. 114; Sanders v. Miller, 79 Ky. 517; Mallory v. Mallory, 92 Ky. 316. This being so, it would seem under the rule, *supra*, that as the consideration of marriage in the instant case is an entire,

as well as a valid one, the conceded legal promise to pay $25,000.00 based upon it, should be upheld and enforced, notwithstanding the associated illegal promise to pay alimony which is based upon the same valid consideration. Indeed, there is no escape from this conclusion unless the facts of this case are to be differentiated in some way from those in the cases *supra*. We have given unsparing pains to the investigation of the authorities, not only those herein given, but the ones to which counsel refer us as well, and we fail to find in any of them any justifiable grounds for making a distinction between the facts therein and those here.

As we view the authorities, the error, to our minds, in the contention of counsel for appellant lies in the fact that he confuses the *promises* in the contract with the *consideration* therefor. In other words, he insists that the two promises found in the contract, the one being legal and the other illegal, as we have found, constitute the consideration for the marriage contract, which, as we have seen, is contrary to all the authorities, including the opinions of this court. As illustrating this, he strongly relies on the opinion of this court in the case of McClane v. Dixon, *supra*. In that case, McClane, a white man, was living in a state of concubinage with a negress named Motina Dixon. By him she had given birth to some illegitimate children, and he was about to be proceeded against in a bastardy proceeding to provide maintenance for the children. It is shown that at this juncture he entered into a contract with the mother to support the children and at his death make provision for them in his will, provided, however, the mother of the children would continue to live with him as theretofore. He failed to make the provision for the children in his will as agreed, which it was claimed was to be a house and lot worth $800.00, and his estate was sued to recover the value of the house and lot. But this court, denied the plaintiff the right to recover, not because the agreement to provide for the children was illegal, but because a part of the *consideration* for the promise to make the devise upon which the suit was based, was illegal, in that it contracted for the continued existence of unlawful relation between the plaintiff and the decedent. The opinion was proper and in perfect accord with the rule herein stated. If, in that case, the consideration for the promise had not been tainted

with the worst form of illegality, there would have been
no obstacle in the way, as far as the contract was con-
cerned, of rendering judgment in favor of the plaintiff.
But, as we have seen, we are dealing with no such case.
The consideration here has been entirely executed,
which in some jurisdictions materially affects the case,
even should the rule contended for by appellant's coun-
sel be applied. Re Appleby, 10 L. R. A. (N. S.) 590,
and authorities therein cited.

It must also not be forgotten that the contract under
consideration not only contained two promises on behalf
of the future husband, but they related to entirely sepa-
rate and distinct events; the events to which the illegal
promise related never occurred and there has been no
occasion to invoke the aid of the court to enforce it.
The event, however, to which the other promise related,
has occurred, and its enforcement is sought in this suit.
Many of the authorities relied upon for reversal had
under consideration only the enforcement of the *illegal*
promise therein, which was similar to the one here, and
of course, the courts in this instance, denied the relief
which was demanded, just as we would if the stipula-
tion as to the payment of $10,000.00 alimony was before
us in proceedings wherein either of the parties was
seeking to enforce it. This is particularly so as to the
case of Neddo v. Neddo, 56 Kan. 507, upon which con-
siderable stress is made in appellant's brief. Moreover,
in the case of Re Appleby, *supra,* the antenuptial contract
had in it a stipulation referring to future separation, it
being as follows:

"Provided always, and this promise and covenant is
made with the reservation, that in the event said mar-
riage does not take place, or said party of the second
part shall not be my husband at the time of my death,
or in the event at the time of my death the parties sign-
ing said Exhibit A. are not living together as husband
and wife  *  *  *  then all and every claim and right
on the part of said party of the second part to demand
or receive said annuity or take any benefit under this
agreement or in my estate shall thereupon and forth-
with cease and be of no force or effect."

The provision was being made by the contemplated
wife for the future husband and it was to be an annuity
of $10,000.00.

There was as much of an inducement for the wife in that case to bring about such a state of affairs as to cause a divorce, and thus save to her estate the annuity of $10,000.00 for the life of her husband, as there is in this case (as argued by appellant's counsel), for the deceased (Stratton) to be guilty of conduct causing a separation and thereby save to his estate $15,000.00. However, in disposing of this feature of that contract the court very pertinently said:

"The second proposition of appellant is that the antenuptial contract was void, because it tended to induce a separation between husband and wife. This contention is founded upon that part of the contract, repeated in the will, wherein it was provided that if, at the death of Mrs. Appleby, appellant should not be her husband, or in the event they 'shall not then be living together as husband and wife,' any and all right to the annuity shall 'cease and be of no force or effect.' It is elementary that contracts which tend to induce a separation of husband and wife are, upon the same principle of public policy which discountenances contracts in restraint of marriage, utterly void and of no force or effect. There is but one voice in the decisions upon this question. Cartwright v. Cartwright, 22 L. J. Ch. (N. S.) 841; H——————— v. W——————, 3 Kay & J. 382; Brown v. Peck, 1 Eden 140; Randall v. Randall, 37 Mich. 563; Boland v. O'Neil, 72 Conn. 217, 44 Atl. 15; Hutton v. Hutton, 3 Pa. St. 100. But the contract under consideration does not bring the case within this principle. A broad view of its provisions will not justify or warrant the conclusion that its purpose was to facilitate, or that it tended in any measure to induce, a separation of the parties. On the contrary, it is clear that its purpose and tendency was to induce continued cohabitation as husband and wife. Appellant was firmly obligated to comply with the contract in this respect, and a failure forfeited the annuity. It was not incorporated in the contract to furnish the wife, upon some whimsical or capricious notion, induced, perhaps, by a condition of not unusual occurrence, a family jar, not ordinarily of long duration, an excuse to separate from her husband. The contract held out to her, as in many of the cases cited by appellant, no pecuniary or other inducement to bring about a separation. Causing one would result in no benefit or advantage to her. The

result would in such an event only increase the charity fund to which she devoted her estate.

"It is unnecessary to enter into an extended discussion of the authorities upon this subject. Many analogous cases are found in the books, but the decisions all turned where the contracts were held void, upon the construction of the particular language and phraseology of each. The case of Re Hope Johnstone (1904) 1 Ch. 470, is an instructive one, and may be referred to. In that case, Hope Johnstone, the husband, conveyed certain property in trust for the benefit of his wife for life, 'or so long as she shall continue the co-habiting wife or widow.' It was there contended that this was an inducement to separation, and hence void; that a separation would result beneficially to the husband; and that he could, by improper treatment of the wife, bring about a separation and reap the benefit of his wrongful conduct. The court brushed these arguments aside and sustained the contract. The case is squarely in point."

The character of contract with which we are dealing is a favorite of the law and will not be held invalid for trifling or technical reasons. Wherever they are fair and free from fraud and concealment, the courts delight to enforce them when it can be done by reconciling the facts under which they are executed with the well recognized rules of law governing the execution and validity of contracts. Hence, it is stated in 21 Cyc. page 1242: "Such settlements have long been favored by courts of equity, provided that the rights of third persons have not been infringed." And, in the notes to the case of Becker v. Becker, 26 L. R. A. (N. S.) 858, upon this and other points considered in this case, it is said:

"Marriage is a sufficient consideration to support an antenuptial agreement, either between the immediate contracting parties or third persons. Indeed it is ranked as among the most valuable of considerations, although distinguishable from other valuable considerations in that it is not capable of being reduced to a value which can be expressed in dollars and cents, and also in that, after the marriage, the status cannot be changed by setting it aside, rescinding, or canceling it, and hence the parties can not be placed in *status quo*. Therefore sound policy requires the enforcement of contracts entered into prior thereto and which induced the marriage. Lloyd v. Lloyd, 2 Myl. & C. 192; North

v. Ansell, 2 P. Wms. 618; Mitford v. Mitford, 9 Ves. Jr. 87; Corsbie v. Free, Craig & Ph. 64; Burridge v. Row, 1 Young & C. Ch. Cas. 583; Turner v. Warren, 160 Pa. 336, 28 Atl. 781; Metz v. Blackburn, 9 Wyo. 481, 65 Pac. 857; Barnes v. Barnes, 110 Cal. 418; 42 Pac. 904.

"It is a rule of law established at an early time that, in the interpretation of covenants, they will be construed to be either dependent or independent of each other, according to the intention and meaning of the parties and the good sense of the case, and technical words will be construed according to such intention. So, where a covenant goes only to part of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independent covenant, and an action can be maintained for the breach of the covenant on the part of the defendant without avering performance in the declaration. This rule is enforced with great liberality as to covenants contained in marriage settlements, and such covenants will be held to be independent rather than dependent, unless the clear language of the contract requires a contrary holding, at least where, to hold that the covenant was dependent would be to defeat the right to the performance of an antenuptial marriage settlement, the primary consideration of which was marriage."

We have read with great care and interest the brief of counsel for appellant, manifesting as it does, great earnestness and zeal in behalf of his client to the effect, that the provision in the contract under consideration, for alimony, being void, vitiates the entire contract, but we must confess that he has failed to convince us with his views. On the contrary, we are constrained to the conclusion that the trial court in holding the stipulation for the payment of the $25,000.00 to the appellant as the widow of her deceased husband in lieu of all other property in his estate, is the correct view of the law as applicable to the facts found in this record.

By the judgment, the court allowed to appellant as administratrix certain items which are contested by cross-appeal prosecuted by appellee. The matters thus drawn in question by the cross-appeal are: A credit for poultry feed amounting to $40.05; one paid to Otto Breen for taking care of the home place at Crestwood, $115.00; bill of costs paid to the clerk of the Oldham circuit court, $29.20; $800.00, which is alleged to be a

balance of some express checks carried by the couple on their trip abroad, and which were made payable to Mrs. Stratton before their departure; $2,000.00, being the amount of a draft which had been ordered by the husband to be sent to the wife at Chicago and made payable to her; $6,055.00 as commission allowed to her as administratrix, and $1,000.00 allowed to her as attorneys' fee. There is also complaint on the cross-appeal that the court refused to charge the appellant as administratrix with rents for the homestead during the time that she has occupied it since her husband's death.

As to the first three of these items it is sufficient to say, that, as we have stated in the beginning, there has been much bitter and protracted litigation between the appellant and appellee concerning the estate of Mr. Stratton. Even the right of the appellant to administer upon his estate is questioned and was bitterly fought. There is a total absence of harmony or kind feelings existing between the parties. The trial court was fully aware of all of this and with the entire record before him he made the allowances in question, and we are not disposed, especially in view of their comparative insignificance, to question his ruling in this particular.

As to the item of $6,055.00 for commissions, section 3883 of the Kentucky Statutes provides, that the allowance to a personal representative shall not exceed five per cent. on the amounts received and distributed by him. It is further therein provided, however, that allowance may be made to him for extraordinary services in the discharge of his duties in attending to, and administering the estate in his hands, but such allowance shall not exceed the amount of a fair compensation "for the time occupied and expenses incurred in protecting, attending to, collecting, and settling such estate, and five per cent. on all amounts received and distributed." This court has held in a number of cases that where the property was distributed in kind, and the administrator was put to no trouble or comparatively none, he should not be allowed the maximum sum of five per cent. of the value of the property thus distributed. (Stanberry's Admr. v. Robinson, 16 Ky. L. R. 309; Fidelity Trust & Safety Vault Co. v. Watkin's etc., 19 Ky. L. R. 957; Gar v. Ray, 20 Ky. L. R. 1697; Glover v. Cheek, 24 Ky. L. R. 1281; Reed v. Reed, 23 Ky. L. R. 2186; Clark v. Young, 24 Ky. L. R. 2395). It was furthermore held

in these cases that because the personalty was distributed in kind, it did not necessarily follow that the personal representative should not be allowed anything for his services, but that in such cases the court should make a reasonable allowance to him to be governed by the facts of each case. In the Glover case, *supra,* there came into the hands of the personal representative for actual distribution, only $52,797.09.   Bequests in the will were satisfied by the transfer to the devisees, shares of the capital stock of certain corporations. There was also some litigation concerning the estate, but this court determined that the personal representative should be allowed $5,000.00, which was nearly ten per cent. of the amount which actually came into his hands for distribution.   To have allowed five per cent. on the entire amount of personal property belonging to the decedent would have amounted to much more than this.

In the Stanberry case, *supra,* there came into the hands of the personal representative stocks and bonds of the value of $213,924.28, which he distributed in kind, and the court made him an allowance for these services the sum of $6,000.00, which, upon appeal to this court, was affirmed.

The allowance complained of here is substantially the same as that in the Stanberry case, although the amount of the property involved is not quite so large. In view of these decisions and the size of this estate, after reviewing the record, we are not inclined to dispute the correctness of the judgment of the court in fixing this allowance.

As to the attorneys' fee, what we have said will largely apply to it.   Matters of this character are necessarily left largely to the discretion of the trial court. That the appellant was entitled to have a reasonable attorneys' fee allowed to her can not be questioned, and without further elaborating this opinion we are not disposed to criticise the action of the court below in fixing this fee at $1,000.00.

As to the two items of $800.00 and $2,000.00, the proof shows that these sums were given to the appellant by her husband, and although it might have been the expectation that they would be consumed in paying the expenses of their trip, still there is nothing to show that he intended or expected that his wife should account to him for any of this money upon their return, or that

he had any other purpose in view than to divest himself of these sums and to vest his wife with absolute ownership therein. We are acquainted with no law whereby the wife should be charged by her husband's estate with money which he may have advanced to her in his lifetime, in the absence of some kind of understanding to that effect.

As we have seen, the only person interested in this estate, besides the widow, is the appellee, whose home is in the State of Oregon. The statutes provide that the widow shall have a right to occupy the homestead of the deceased husband until allotment of dower, homestead, or the estate is otherwise distributed. We are not inclined to the opinion that, because there was an antenuptial contract, the widow was thereby deprived of this right given to her by the statutes. The effect of the contract is to limit the estate which the widow, as one of the distributees of decedent, may take in her deceased husband's property. It does not affect any other right which she may have as widow. Moreover, as the only other interested person in the estate of the decedent was a non-resident and lived a great distance from the homestead, and it being necessary to the preservation of the property that it should be occupied and looked after, all of which was beneficial to the heir, we are not disposed to permit the latter under such circumstances to charge the widow with rent when her occupancy was beneficial to the property which was inherited by the heir.

It results, therefore, that the judgment on both the appeal and cross-appeal should be, and it is affirmed.

Whole court sitting.