**Pamela Ford BLUE, Appellant,**

v.

**David Stanley BLUE, Appellee.**

No. 1999–CA–002904–MR.

Court of Appeals of Kentucky.

May 4, 2001.

Discretionary Review Denied
by Supreme Court Denied Dec. 12, 2001.

Dan L. Owens, Charles M. Pritchett, Jr., Kathy P. Holder, Brown, Todd, & Heyburn, PLLC, Louisville, KY., for Appellant.

Cynthia Compton Stone, Vicki L. Buba, Stone, Pregliasco, Haynes, Buba, LLP, Louisville, KY., for Appellee.

Before HUDDLESTON, KNOPF, and MILLER, Judges.

*OPINION*

KNOPF, Judge:

By orders entered October 25, 1999, and November 10, 1999, the Jefferson Family Court upheld a premarital property agreement between David Blue and Pamela Blue. The trial court erred, Pamela contends, by failing to recognize that a large increase in the value of the property has rendered the agreement unconscionably favorable to David and hence unenforceable. Pamela further asserts that the trial court evaluated the agreement according to an incorrect standard of validity and failed to demand from David a sufficiently detailed statement of his holdings and net worth. Although we agree with Pamela that the trial court's scrutiny of the agreement seems to have been unduly limited, we are persuaded that the error was harmless. Accordingly, we affirm.

David and Pamela married each other for the second time on May 2, 1988. They had previously married in March 1982. That marriage ended in divorce in November 1987. During the pendency of the first divorce, David and Pamela considered reconciling, and those considerations led to their remarriage the next year. They both had children during earlier marriages, but no children were born during their marriages to each other.

Among the couple's concerns as they contemplated reconciling and remarrying was a property settlement. David was president of Louisville Scrap Material Company, Inc., with extensive ownership interests in that company and in other assets. His net worth immediately following the 1987 divorce was estimated to be in excess of five million dollars. Pamela's estate at that time was approximately $190,000.00, including what had been awarded to her in the divorce.

The settlement agreement the parties had entered prior to their 1982 marriage needed to be revised, so in February 1988 Pamela's attorney began preparing a new agreement. After some negotiations, David and Pamela reached a consensus on the terms of their new prenuptial agreement, which they both signed on May 2, 1988. Under their agreement, only property acquired in their joint names or expressly designated during the marriage as "joint" would, in the event of divorce, be subject to division. Otherwise,

> [a]ll property owned by each party on the date of the marriage shall be deemed to be the owner's separate property and shall remain his or her separate property after the marriage unless converted to joint property.... Any appreciation, improvements to or income earned by separate property shall be separate property and belong to the owner of the property which produced it. Any purchase, exchange or acquisition of other property from the proceeds or exchange of either party's separate property shall be deemed the separate property of that party who exchanges, sells or otherwise converts his or her separate property. All income earned by the parties after the marriage shall be the separate property of the party who earned the income. Any gift, inheritance, bequest, or devise shall be the separate property of the party who received it.[1]

In essence, the agreement provides that in lieu of the statutory provisions with respect to marital property, David and Pamela's separate holdings and incomes will remain separate and, in the event of divorce, Pamela will receive a vehicle, furniture, certain personal effects, and cash in an amount reflecting the length of the marriage—here, according to Pamela, about $650,000.00.

In February 1999, David filed a petition for dissolution of the marriage. About two months later, he moved for a declaration of rights holding that the May 1988 property agreement is valid and enforceable. The trial court granted David's motion. The court noted that Pamela does not allege that the agreement was obtained through fraud, duress, mistake, or nondisclosure of material facts. The trial court further found that the agreement was not unconscionable when it was executed. Pamela argued that circumstances had changed since 1988 when she and David executed the agreement, to the extent that the agreement has now become manifestly unfair and thus unenforceable. In particular, she notes that David's net worth has increased substantially, to as much as twenty-four million dollars according to one of his discovery responses and possibly even more, inasmuch as another late-filed discovery response indicates that in 1998 David sold his interest in Louisville Scrap Material Company for a gross amount in the neighborhood of seventy-seven million dollars. Because as David's wife Pamela contributed various homemaker services to David's business ventures and did not pursue an outside career of her own, she contends that it would now be unconscionable to enforce the prenuptial agreement strictly according to its terms and to deny her any share of what, absent the agreement, would be her and David's very large marital estate.

In granting David's motion to uphold the agreement, the trial court found that no increase in David's net worth, however great, would render the agreement unconscionable with respect to Pamela "absent some negative change in her financial condition." The court found no evidence that

---

1. Antenuptial Agreement, ¶ 1.2 (Separate Property).

Pamela's financial condition had deteriorated during the marriage. The trial court also found that, given the explicit terms of the agreement, Pamela had no reasonable expectation that she would share in the appreciation of David's assets, "whether she served as a business hostess, traveled with her husband, [or] gave up her career...."

On appeal, Pamela alleges three grounds of error by the trial court. First, she asserts that the trial court failed to use the correct legal standard to determine whether the prenuptial agreement was unconscionable at the time enforcement was sought. Second, Pamela contends that the trial court failed to make specific findings concerning the extent of David's assets. And third, she argues that the trial court failed to consider the enormous increase in David's wealth as a basis for holding the agreement unconscionable.

Since 1972, Kentucky's version of the Uniform Marriage and Divorce Act, KRS Chapter 403, has provided as a general rule that the property a husband and wife acquire during the course of their marriage shall be subject to equitable division between them in the event of divorce. By virtue of the prenuptial agreement executed May 2, 1988, Pamela and David agreed to forego this right of equitable division. Under the agreement, Pamela has no rights to much of the property acquired during the marriage, or to the increase in value of David's nonmarital assets.

Traditionally, in such cases as *Stratton v. Wilson* and its progeny, Kentucky courts recognized the validity of prenuptial agreements only so far as they were intended to take effect upon death.[2] But to the extent that any provisions of a prenuptial agreement contemplated divorce or separation, our courts held that they were against public policy and therefore void.[3] In 1990, the Kentucky Supreme Court specifically overruled *Stratton*, and held that premarital contracts which provide for the disposition of property in the event of divorce may be enforced.[4] However, in *Gentry v. Gentry*, our Supreme Court stated that enforcement of such agreements is subject to three limitations:

[T]he trial judge should employ basically three criteria in determining whether to enforce ... [a prenuptial] agreement in a particular case: (1) Was the agreement obtained through fraud, duress or mistake, or through misrepresentation or non-disclosure of material facts? (2) Is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed so as to make its enforcement unfair and unreasonable?[5]

In her statement of the case, Pamela claims that there were irregularities in the execution of the agreement. However, she does not assert that these irregularities amount to fraud, duress, mistake, or a misrepresentation or nondisclosure of material facts. Furthermore, Pamela does not contest the trial court's finding that the agreement was conscionable at the time it was made. Rather, Pamela argues that the trial court misconstrued the third criterion in the *Gentry* test: Have the facts and circumstances changed since the

2. *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522 (1916). *See also Lipski v. Lipski*, Ky., 510 S.W.2d 6 (1974); *Collins v. Bauman*, 125 Ky. 846, 102 S.W. 815 (1907); and *Forwood v. Forwood*, 86 Ky. 114, 5 S.W. 361 (1887).

3. *Stratton*, 185 S.W. at 525.

4. *Gentry v. Gentry*, Ky., 798 S.W.2d 928, 936 (1990); and *Edwardson v. Edwardson*, Ky., 798 S.W.2d 941, 945 (1990).

5. *Gentry*, 798 S.W.2d at 936 (*quoting Scherer v. Scherer*, 249 Ga. 635, 641, 292 S.E.2d 662, 666 (1982)).

agreement was executed so as to make its enforcement unfair and unreasonable?

 We agree with Pamela that prenuptial contracts are subject to review for conscionability at the time enforcement is sought. Unlike parties who execute a property settlement agreement at the end of a marriage, parties entering into a prenuptial agreement at the beginning of a marriage are sometimes not as likely to exercise the fullest degree of vigilance in protecting their respective interests. Often there will be many years between the execution of a prenuptial agreement and the time of its enforcement. It is, therefore, appropriate that the court review such agreements at the time of termination of the marriage, whether by death or by divorce, to ensure that facts and circumstances have not changed since the agreement was executed to such an extent as to render its enforcement unconscionable.[6]

 Nevertheless, the definition of the word "unconscionable" remains the same for both separation and prenuptial agreements. An agreement is unconscionable and must be set aside if the court determines that it is manifestly unfair and unreasonable.[7] The opponent of the agreement has the burden of proving the agreement is invalid or should be modified.[8]

Neither *Gentry* nor its companion case *Edwardson v. Edwardson* discusses what type of a change in circumstances at the time enforcement is sought will render a prenuptial agreement unconscionable. In *Gentry*, the husband's financial condition had declined substantially during the marriage and the wife's financial condition had remained about the same. Our Supreme Court held that trial courts should consider the parties' respective financial conditions at the time of divorce as well as any joint efforts toward the accumulation of marital property.[9] Nevertheless, the Court found that the agreement was not manifestly unfair in light of the respective financial conditions and contributions of the parties. In *Edwardson*, the Court further held that the fairness of prenuptial agreements must be considered on a case-by-case basis.[10]

In determining the fairness of the prenuptial agreement in this case, the trial court also relied on the opinion of the Indiana Court of Appeals in *Justus v. Justus.*[11] In *Justus*, as in the present case, the couple entered into a prenuptial agreement freely, without fraud, duress, or misrepresentation. Furthermore, the agreement was fair to both parties at the time it was entered. As in *Gentry*, the Indiana Court of Appeals found that the provisions of a prenuptial agreement may become voidable as unconscionable due to circumstances existing at the time of dissolution.

After reviewing cases from other jurisdictions,[12] the Indiana court noted the general rule among states which consider the validity of prenuptial agreements at the time enforcement is sought:

[a] court may decline to enforce an antenuptial agreement, but only where enforcement would leave a spouse in the

---

6. *Gentry*, 798 S.W.2d at 936.

7. *Shraberg v. Shraberg*, Ky., 939 S.W.2d 330, 333 (1997).

8. *Rupley v. Rupley*, Ky.App., 776 S.W.2d 849 (1989).

9. *Gentry*, 798 S.W.2d at 936.

10. *Edwardson*, 798 S.W.2d at 946.

11. 581 N.E.2d 1265 (Ind.App., 1991)

12. *MacFarlane v. Rich*, 132 N.H. 608, 614, 567 A.2d 585, 589 (1989); *Lewis v. Lewis*, 69 Haw. 497, 748 P.2d 1362 (1988); and *Newman v. Newman*, 653 P.2d 728 (Colo.1982).

position where he would be unable to support himself. At that point, the state's interest in not having the spouse become a public charge outweighs the parties' freedom to contract.[13]

Turning to the facts of the case before it, the Indiana Court agreed that there was evidence to support the trial court's finding that the husband had suffered drastic financial reversals. However, the trial court there did not make any findings concerning his ability to support himself. The Indiana Court of Appeals concluded that the husband could only be relieved of his obligations under the agreement if there was evidence that he would be unable to provide for himself if the prenuptial agreement was enforced.[14]

■ Following the same reasoning, the trial court in this case took note of the fact that while David's net worth increased substantially during the marriage, Pamela's financial condition has either remained the same or improved slightly. Since David and Pamela's financial conditions were already disparate when they married in 1988, the trial court concluded that an increase in David's assets, by whatever percentage, does not render the agreement unconscionable to Pamela in the absence of some negative change in her financial situation.

■ We are concerned that this narrow focus may have precluded consideration of other grounds which might justify setting aside a prenuptial agreement. We certainly agree that trial courts retain broad discretion to review prenuptial

agreements to prevent one spouse from being unjustly enriched while another spouse is left destitute.[15] But *Edwardson* also goes on to explain that "[r]egardless of the terms of the agreement and regardless of the subsequent acquisition or loss of assets, at the time enforcement is sought, the court should be satisfied that the agreement is not unconscionable."[16] Therefore, we do not agree with the Indiana Court of Appeals that a party must prove that he or she will be impoverished before a court may set aside a prenuptial agreement.

■ Rather, a broader and more appropriate test of the substantive fairness of a prenuptial agreement requires a finding that the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work an injustice.[17] Pamela argues that the vast increase in the value of David's assets renders the agreement unconscionably one-sided to David. She further argues that the trial court erred in failing to allow her to complete discovery into David's true net worth.

■ We agree with Pamela that a finding of unconscionability requires a comparison of the situations of the two parties, and that a gross disparity between the parties' resources may render a prenuptial agreement unconscionable.[18] However, the emphasis of this inquiry relates to the reasonable expectations of the parties as contemplated by the agreement. As noted by the trial court, the parties' financial

---

13. 581 N.E.2d at 1273.

14. *Id.* at *Justus*, 581 N.E.2d at 1274–75.

15. *Gentry*, 798 S.W.2d at 934.

16. *Edwardson*, 798 S.W.2d at 945.

17. *See McKee–Johnson v. Johnson*, 444 N.W.2d 259, 266–67 (Minn.1989); *MacFarlane v. Rich*, 132 N.H. at 614, 567 A.2d at 589; *McHugh v. McHugh*, 181 Conn. 482, 485–86, 436 A.2d 8, 11 (1980).

18. *Rider v. Rider*, 669 N.E.2d 160, 164 (Ind. 1996).

situations were already disparate when they entered into the agreement.

Pamela agreed to forego any share in the increase in value of Donald's assets. She took the risk that Donald's assets could appreciate substantially. The trial court further found that Pamela's contributions to the increase in value of David's nonmarital property were not beyond the contemplation of the parties in the agreement. Furthermore, Pamela will receive about the same amount of assets as she bargained to receive, and she remains eligible to receive maintenance from David should the trial court determine that maintenance is justified.

Given these circumstances, the mere increase in the value of David's nonmarital property, by whatever percentage, does not render the prenuptial agreement unconscionable as to Pamela. Additional discovery with respect to David's assets would therefore serve no purpose. To set aside the agreement, Pamela must show more than that David's position has improved. She must also show that her position has suffered in a manner which was beyond the contemplation of the parties when they signed the agreement. In the alternative, Pamela must establish that the agreement is oppressive or manifestly unfair to her at the time of dissolution. Despite the limited scope of the trial court's consideration of the issue of unconscionability, Pamela did not present any evidence to support such findings. Consequently, we find that the trial court was correct in holding that the prenuptial agreement is not unconscionable and may be enforced.

Accordingly, the judgment of the Jefferson Family Court is affirmed.

ALL CONCUR.