Paula O. LANE, Appellant,

v.

David L. LANE, Appellee.

No. 2004–SC–000151–DG.

Supreme Court of Kentucky.

Sept. 21, 2006.

John T. Reed, Paducah, Counsel for Appellant.

James B. Brien, Jr., Rebecca Prince Biehslich, Neely & Brien, Mayfield, Counsel for Appellee.

## OPINION

LAMBERT, Chief Justice.

Three days before their marriage on November 24, 1990, Appellant, Paula O. Lane, and Appellee, David L. Lane, entered into an ante-nuptial agreement. Appropriate asset disclosures were made and the underlying validity of the agreement is not at issue herein. What is at issue is whether events subsequent to the nine and a half year marriage and the birth of two children render enforcement of the agreement unconscionable. The Court of Appeals' opinion strictly enforced the agreement as written. The trial court had deviated from a strict application of the agreement on a determination of unconscionability. We granted discretionary review.

At the time of their marriage, Appellant was working as a night desk clerk in a hotel earning $19,000 a year. She was twenty-nine years of age. Despite his youthful age of twenty-six, Appellee was already a successful stockbroker at Ed-

ward D. Jones and Company, earning $166,000 per year. Appellee was a college graduate while Appellant had only a high school education. Two children were born of the marriage, after which Appellant did not work outside the home as she was the primary caregiver for the children. By the time the marriage was dissolved, Appellee had achieved great financial success. He was earning approximately one million dollars per year and he was a partner in a regional brokerage firm.

According to the agreement, the parties waived their rights under the law to claim maintenance in the event the marriage was dissolved. The parties further agreed that the separate property of each would be deemed nonmarital in the event of divorce. The agreement explicitly identified certain items as Appellee's separate property. These items were two parcels of real estate (not relevant here), a partnership interest in Edward D. Jones, and Appellee's pension plan, profit sharing plan and voluntary profit sharing plan through Edward D. Jones. The agreement further provided that should either party default in or breach any obligations contained therein, the defaulting party would be responsible for attorney's fees, court costs, costs of depositions, transportation, lodging, and other related expenses. As there was a dramatic difference in the parties' economic circumstances when enforcement of the agreement was sought, we must determine whether the doctrine of unconscionability allows relief to Appellant.

The trial court found the provisions of the agreement regarding waiver of maintenance and the imposition of attorney's fees on a defaulting party to be unconscionable. It further found Appellee's 401(k) plan to be marital property despite language in the agreement excepting pension and profit sharing plans. On appeal, the Court of Appeals strictly enforced the agreement,

reversing the trial court's decision regarding maintenance and the 401(k) plan. It upheld the trial court's award of attorney's fees, not because the provision was unconscionable, but because it did not regard Appellant as a defaulting or breaching party under the relevant provision of the agreement.

■ This Court has embraced the view that ante-nuptial agreements are not per se invalid as against public policy.[1] However, courts retain the right to analyze such agreements for unconscionability at the time of enforcement.[2] In this proceeding, Appellant has failed to persuade us to reverse both courts below on her contention that the entire agreement is unconscionable. Neither the trial court nor the Court of Appeals reached such a conclusion and neither do we. On the other hand, we are persuaded that the Court of Appeals failed to give due deference to the trial court's determination that the provision of the agreement regarding waiver of maintenance was unconscionable.[3]

From the time this Court first recognized the validity and enforceability of ante-nuptial agreements, we have included the following qualification:

The ingenuity of persons contemplating marriage to fashion unusual agreements, particularly with the assistance of counsel, cannot be overestimated. We will observe the tradition whereby the law develops on a case by case basis. It should be recognized, however, that trial courts have been vested with broad discretion to modify or invalidate ante-nuptial agreements.[4]

■ Thus, it is beyond reasonable dispute that a trial court may modify or invalidate all or part of an ante-nuptial agreement where enforcement is unconscionable in its application. This includes cases where "the facts and circumstances changed since the agreement was executed so as to make its enforcement unfair and unreasonable."[5] On this basis, the trial court modified the agreement and ordered Appellee to pay maintenance of $12,000.00 per month for three years.

In reversing the trial court's award of maintenance, the Court of Appeals relied on *Blue v. Blue*[6] to vacate the award and strictly enforce the ante-nuptial agreement. However, in so doing, the Court of Appeals failed to accord the proper deference owed to the trial court[7] and overlooked the dictates of *Edwardson v. Edwardson* providing that each agreement should be reviewed on a case-by-case basis. While this Court is not bound by the Court of Appeals decision in *Blue*, it is nevertheless distinguishable. As such, we need not re-examine *Blue* at this time. The parties' circumstances in *Blue* were vastly different than those present here. In *Blue*, both parties had children by earlier marriages and they had married each other twice, but without children born of either of their marriages. Even more striking is the fact that the wife in *Blue* still had a right to remedy the vast income

1. *Gentry v. Gentry*, 798 S.W.2d 928 (Ky.1990) (*overruling Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522 (1916)).

2. *Edwardson v. Edwardson*, 798 S.W.2d 941 (Ky.1990).

3. *Id.* at 946 ("It should be recognized, however, that trial courts have been vested with broad discretion to modify or invalidate ante-nuptial agreements.")

4. *Id.*

5. *Gentry*, 798 S.W.2d at 936.

6. 60 S.W.3d 585 (Ky.App.2001).

7. *Id.* at 590 ("We certainly agree that trial courts retain broad discretion to review prenuptial agreements ....").

disparity between the spouses by seeking a maintenance award. In this case, the ante-nuptial agreement prevented Appellant not only from receiving the bulk of the marital estate, but also from any entitlement to rehabilitative maintenance. Likewise, *Gentry v. Gentry* and *Edwardson* follow in similar suit, with the parties having prior marriages with no children born of their marriages and none of the agreements containing a total maintenance waiver provision.

■ In the case at bar, this was the first marriage for both Appellant and Appellee and both parties were in their twenties. Two children were born of the marriage and Appellant quit her job to care for the children while Appellee rapidly progressed in his career. While a significant disparity in the parties' incomes existed at the time of the marriage, this disparity grew exponentially during the marriage in large part because the husband was able to concentrate on his career while the wife stayed home to care for the children and the home. Contrary to the dissent's contention, Appellant's discontinuance of employment to rear the children and maintain the household is not of nominal value and should in fairness be considered a substantial factor in this case,[8] along with the affluent lifestyle maintained during their marriage,[9] towards rendering the maintenance waiver provision unconscionable.[10]

Parties who contemplate entering into ante-nuptial agreements have a duty to appropriately consider their circumstances and whether such an agreement is right for them. The more one-sided an agreement appears at the time it is made, the more likely courts are to invalidate the agreement at the time enforcement is sought. Bare-knuckle bargaining is not an appropriate practice. As this was a first marriage between younger persons, it is curious that these parties even wanted an ante-nuptial agreement. Their situation differed vastly from the customary and proper ante-nuptial agreement circumstances where parties desire to preserve their assets for their children and grandchildren.[11] But they made their agreement and it will be enforced, subject to judicial scrutiny for unconscionability.

As the trial court made appropriate findings of fact to support its conclusion of unconscionability with respect to maintenance, the Court of Appeals erred in failing to accord the trial court its proper deference. However, we discern no error in the trial court's failure to grant a longer duration of maintenance. Therefore, on

---

**8.** *See, e.g.,* KRS § 403.190 (contribution of a spouse as homemaker is relevant consideration towards the acquisition of marital property); *Goderwis v. Goderwis,* 780 S.W.2d 39, 40 (Ky.1989) (increased value of husband's business during marriage was marital even though wife's contributions towards the business were in the indirect role as homemaker). *Cf. Shraberg v. Shraberg,* 939 S.W.2d 330, 333 (Ky.1997) (in finding a separation agreement to be unconscionable, the court cited the long established principle that dealings between spouses whereby one spouse obtains the property of another without consideration must be looked upon with suspicion).

**9.** *See, e.g., Ware v. Ware,* 131 Md.App. 207, 748 A.2d 1031, 1047 (2000)(in citing the sub-

stantial effect that large income disparities have on the children of a marriage, the court stated "[t]here is a child involved, who will undoubtedly go back and forth between the father, who can afford to live in luxury, and the mother, who cannot.")

**10.** *See Shraberg v. Shraberg,* 939 S.W.2d 330, 333 (Ky.1997) (Unconscionability requires a showing of "fundamental unfairness as determined 'after considering the economic circumstances of the parties and any other relevant evidence . . . .' ").

**11.** *See, e.g., Edwardson,* 798 S.W.2d 941; *Gentry,* 798 S.W.2d 928; *Blue,* 60 S.W.3d 585.

the maintenance issue, we reinstate the judgment of the trial court.

■ Appellant also contends that the trial court's award of attorney's fees and expert witness fees was insufficient and constituted an abuse of discretion. However, the trial court awarded Appellant $59,271.08 in attorney's fees. The allowance of such fees is within the broad discretion of trial courts in such matters and we see no abuse of that discretion. However, we will remand the case to the trial court for consideration of whether additional attorney's fees and costs incurred during the appellate process should be granted and in what amount.

■ Appellant also argues that the trial court incorrectly valued Appellee's general partnership interest in Edward D. Jones, an item of property acquired during the marriage and determined to be marital property subject to division. The trial court held an extensive evidentiary hearing and heard sharply conflicting expert testimony regarding the value of the partnership interest. Ultimately, it found the value of the partnership interest to be book value, which was $269,876.00. The trial court's valuation should not be disturbed absent a determination that it is clearly erroneous.[12] The Court of Appeals affirmed the trial court on this issue and we, likewise, affirm.

Finally, we will touch upon an issue that was addressed by the Court of Appeals but not presented here: whether Appellee's 401(k) plan valued at $238,000 was covered by the agreement. The trial court included this asset in the marital estate on the view that the agreement provision relating to Appellant's pension and profit-sharing plans did not embrace the 401(k) plan. The Court of Appeals reached the opposite conclusion:

It is clear that the parties intended to refer to David's 401(k) plan as a "pension plan" in the ante nuptial agreement. Therefore, the family court erred when it included David's 401(k) account as part of the marital estate subject to division.

Appellant could have raised an issue in this Court as to the Court of Appeals' reversal of the trial court on the 401(k) issue, but she did not. We have carefully reviewed her issue statements, the text of her brief, and her request for relief, and find nothing that could be fairly described as contesting the Court of Appeals' resolution of the 401(k) issue. As such, we express no opinion as to the 401(k) plan.

For the reasons stated herein, we reverse in part, affirm in part, and remand to the trial court for entry of judgment consistent herewith. On remand, the trial court should also determine whether additional attorney's fees and costs should be awarded to Appellant for the costs of legal services incurred during the appellate process.

GRAVES, ROACH, SCOTT, and WINTERSHEIMER, JJ., concur.

GRAVES, J., files a separate concurring opinion in which ROACH and WINTERSHEIMER, JJ., join.

McANULTY, J., dissents by separate opinion.

MINTON, J., not sitting.

GRAVES, Justice, concurring.

I concur with the majority but write separately to express some additional thoughts in this case. Entering such an antenuptial agreement during the period of excitement on the eve of a wedding

12. *Duncan v. Duncan,* 724 S.W.2d 231 (Ky. App.1987); CR 52.01.

evokes questions about the sufficiency of the parties' consent and indicates that Appellee likely had serious mental reservations about marriage as it is defined in Chapter 402 of the Kentucky Revised Statutes. Perhaps, an *anti*-nuptial agreement would be a more apt description as KRS 402.005 defines marriage as a union for life.

The intimate partnership of life and love which constitutes the married state is rooted in the conjugal covenant of irrevocable personal consent. In the eyes of society, marriage receives its stability from the human act by which the partners mutually surrender themselves to each other without any hesitation or reservation whatsoever. While there is no single definitive explanation for the breakdown of the sacred institution of marriage, the casual attitude expressed in this antenuptial agreement is no doubt a facilitating factor contributing to a disturbing trend.

Indeed, Justice Vance's dissents in *Gentry v. Gentry*, 798 S.W.2d 928 (Ky.1990) and *Edwardson v. Edwardson*, 798 S.W.2d 941 (Ky.1990) are just as relevant today as when written. Since 1916, it was the declared public policy of this Commonwealth that antenuptial agreements contemplating divorce and separation were void as they tended to promote (or at least predict) marital instability. *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522, 523 (1916). In *Edwardson*, *supra*, the Court acknowledged that promoting marital stability was a "substantial state interest." *Id.* 945 (citing KRS 403.110). Yet, the *Edwardson* Court nonetheless overruled *Stratton*, *supra*, explaining that the policy declared therein was no longer necessary or pertinent as it was designed primarily to protect women, who were "decidedly second class" citizens at the time. *Id.* at 944. Unfortunately, the great strides made by both women and children, as a class, have done nothing to validate the majority's reasoning in *Edwardson*, *supra*.

While anecdotal, but sadly not surprising, it was the husband and not the wife who scored the commercial deal of the century in this fateful contract. Perhaps the wife felt lucky to receive the scraps she did obtain, as she was granted the ultimate privilege of being this man's wife and bearing his children for at least the duration of her youth. Or perhaps as behavioral studies have continually demonstrated, the wife never believed that her incredibly bad bargain would ever come to fruition. *See Reviewing Premarital Agreements to Protect the State's Interest in Marriage*, 91 Va. L.Rev. 535, 543 (2005) (citing one study demonstrating "that although most people accurately estimated the country's overall divorce rate at fifty percent, they assessed their own chances of divorce at zero").

Our current case law nevertheless mandates that brides and grooms-to-be must be held to their bad bargains, no matter how foolish, last minute, or ill-conceived they may be, unless such bargains rise to the level of being unconscionable. In *Shraberg v. Shraberg*, we acknowledged that there is "a measure of protection for parties from their own irresponsible agreements." 939 S.W.2d 330, 333 (Ky.1997). In that case, we thought it unfair that a husband should have to live on $40,000 per year while his wife and kids enjoyed $160,000 per year. *Id.* This case is similar, yet the parties are flipped, in that the husband will be living on $1,000,000 per year while his kids receive child support (which the dissent assures us is "adequate") and the mother of his children receives nothing.

It is indeed chauvinistic for one to contend that the agreement in this case is somehow fair since the wife was merely

some lowly hotel clerk[1] while the husband was a youthful and successful stockbroker. Perceiving these positions as vastly disparate on life's socioeconomic ladder, some would suggest that the wife's nine and a half years of living beyond her assigned socioeconomic rung with her stockbroker husband was more than enough consideration for her (1) discontinuance of employment; (2) her bearing of two children; (3) her caring for those two children; (4) her maintenance of the household; and (5) her role as her husband's consort, hostess, and social liaison. Indeed, the record demonstrates that the wife held numerous and lavish parties for her husband's associates and held positions in several high-profile community organizations for the purpose of benefiting her husband's reputation and promoting his career.

Yet, as the majority rightly acknowledges, the varied contributions of a homemaker is not of nominal value in this Commonwealth. KRS § 403.190 specifically states that the services of a homemaker spouse is relevant and significant consideration towards the acquisition of marital property. *Id.; see also, Goderwis v. Goderwis,* 780 S.W.2d 39, 40 (Ky.1989). KRS § 403.110 states, more broadly, that the laws of marriage dissolution "shall be liberally construed and applied to promote its underlying purposes" which include; (1) "[s]trengthen and preserve the integrity of marriage and safeguard family relationships;" (2) "[m]itigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage;" and (3) "[m]ake reasonable provision for spouse and minor children during and after litigation." *Id.* The concept codified within these statutes, of course, is that marriage is a partnership that both spouses contribute to in equal, yet differing ways, and that children and the accumulation of financial assets is a corresponding result or byproduct of that partnership. *See Marriage as a Contract and Marriage as a Partnership: The Future of Antenuptial Agreement Law,* 116 Harv. L.Rev.2075 (2003); *Divorce and the Displaced Homemaker: a Discourse on Playing with Dolls, Partnership Buyouts and Dissociation under No–Fault,* 60 U. Chi. L.Rev. 67 (1993).

In the case of homemaker spouses, the division of labor in a family is compartmentalized. One spouse focuses time, talents, and experience to the marketplace while the other spouse focuses equal time, talents, and experience to the family. In such a system, the partnership strives to achieve maximum output and return in two essential areas of life—one spouse will have more time and energy to develop greater skill and earnings potential in the marketplace while the other will have more time and energy to ensure that the children and the household thrive and grow. This system is nothing new and has always been valued as a meaningful and successful model for maintaining both a marriage and a family.[2]

However, when homemaker spouses find themselves in the midst of family breakdown through either separation or divorce, they are prematurely forced to abandon their chosen callings and start anew in the marketplace. These spouses are understandably ill-equipped to compete in such an arena as they are frequently impaired by the loss of youth and lack of skills. Years spent homemaking are viewed by potential employers as years of "unemployment." Contacts and

---

**1.** Who, apparently, was past her prime at the ripe old age of 29.

**2.** This division of labor concept has also been very successful in our modern industrial society, to wit: the assembly line.

relevant experience are almost always lacking on a homemaker's resume and many are simply regarded as too old for entry-level employment. Rehabilitative alimony for homemaker spouses is therefore not a gift, but something these hardworking spouses have earned after years of toiling outside the marketplace on behalf of their families. This is analogous to an on-the-job anatomical injury in workers' compensation and the resulting functional impairment.

The antenuptial agreement in this case is fundamentally unfair in large part because it accords almost no consideration for the wife's contributions as a homemaker in this marriage. Were we to hold as the dissent suggests it would be foolish, indeed, to continue investing in a marriage through the role of a homemaker as such a contribution would be accorded diminished status under the laws of Kentucky and hence, this Court would be contributing to the feminization of poverty.

Fortunately for the children and families in this Commonwealth, the majority continues to respect and protect the partnership theory of marriage, the sanctity of the family, and the important contributions of homemaker spouses as such concepts are codified in our statutory law. *See, e.g.,* KRS §§ 402.005, 403.110, 403.190.

Accordingly, I concur. Roach, and Wintersheimer, J.J., join this concurring opinion.

McANULTY, Justice, dissenting.

Respectfully, I dissent from that portion of the Majority's Opinion affirming the trial court's determination that the provision of the agreement regarding waiver of maintenance was unconscionable. I would affirm the opinion of the Court of Appeals that held that the antenuptial agreement, which included a clause waiving maintenance, spousal support, or alimony payments in the event of divorce, should be given full effect. I believe that the trial court, and now a Majority of this Court, set aside the provisions of the waiver of maintenance clause because it constituted a bad—not unconscionable—bargain for Paula at the time of divorce. I agree with the reasoning of the Court of Appeals that considered the lack of evidence to suggest that the marriage caused Paula to forego the completion of her education so that now her decision to forego joining the work force to pursue her education somehow makes the agreement unfair and unreasonable.

The highest number that Paula agrees that she received in the trial court's division of marital property is $233,593.12. I do not disagree that David is in a significantly better financial position with his monthly income, as found by the trial court, of $95,728.33, but I cannot agree with Paula that the amount that she received will not support her while she sensibly and responsibly pursues her career interests. Nor can I agree that an affluent lifestyle as opposed to a comfortable lifestyle (which I believe Paula and her children can enjoy with her property award plus $3,000.00 per month child support) should necessarily render the maintenance provision unconscionable.

I believe the trial court abused its discretion in declaring the waiver of maintenance provision unconscionable when David and Paula had disparate incomes from the start of the marriage; they signed the antenuptial agreement; they signed the agreement with the assistance and advice of independent counsel and with full knowledge that the agreement substantially altered their marital and property rights, claims, or interests that they would have had but for the execution

of the agreement; and they were married for 9½ years.